**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WILLIAM D. WALLACE, Individually and On Behalf of All Others Similarly Situated, | X : : |
| Plaintiff, | : : |
| v. | : Civil Action No. 11-CV-8861 (TPG) : |
| INTRALINKS HOLDINGS, INC., ANDREW DAMICO and ANTHONY PLESNER, | : : : |
| Defendants. | : X |

**MEMORANDUM OF LAW IN OPPOSITION TO (1) MOTION BY DEFENDANT INTRALINKS HOLDINGS, INC., THE OFFICER DEFENDANTS AND THE DIRECTOR DEFENDANTS TO DISMISS LEAD PLAINTIFF'S CONSOLIDATED CLASS ACTION COMPLAINT AND (2) UNDERWRITER DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND ................................................................................... 3

ARGUMENT ............................................................................................................ 7

    I.    Legal Standard ........................................................................................ 7

    II.    The Complaint States a Claim under Section 10(b) and Rule 10b-5 of the Exchange Act .......................................................................... 7

        A.    The Complaint Adequately Alleges that the Exchange Act Defendants Made False and/or Misleading Statements ................ 8

            1.    Failure to Disclose the Loss of the FDIC .......................... 9

            2.    Failure to Disclose IntraLinks' Misclassification of Revenue or the Overbilling of Customers ...................... 11

        B.    The Complaint Adequately Alleges that the Exchange Act Defendants' False and/or Misleading Statements Were Made with Scienter .................................................................... 13

            1.    The Requirements for Pleading Scienter ........................ 13

            2.    The Complaint Creates a Strong Inference of Scienter as to the FDIC's Impending Departure from IntraLinks ............................................................. 15

                a    The FDIC Directly Informed IntraLinks that It Would Not Renew Its Contract and Issued an RFP ...................................................................... 15

                b    The FDIC Stopped Executing New Task Orders after September 2010 ............................... 17

                c    Because the Facts Alleged Relate to IntraLinks' Core Business, they Support a Strong Inference of Scienter ................................ 18

                d    Motive and Opportunity Allegations Further Support a Strong Inference of Scienter ............... 19

                e    Resignations Support a Strong Inference of Scienter ................................................................. 23

                f    SEC Investigation Supports a Strong Inference of Scienter ............................................ 23

                g    Considered Collectively, the Complaint's Scienter Allegations Create a Strong Inference of Scienter as to the FDIC's Impending Departure ........................................... 24

i

**TABLE OF CONTENTS**
(continued)

**Page**

3.   The Complaint Creates a Strong Inference of
Scienter as to the Misclassification of Revenue and
Customer Overbilling........................................................ 25

C.   The Complaint Adequately Pleads Loss Causation ................... 26

III.   The Complaint Pleads Violations of Sections 11 and 12(a)(2) of
the Securities Act ................................................................... 29

A.   The Securities Act Claims are Subject to Rule 8 ........................ 30

B.   Rule 9(b) Does Not Add a Scienter Requirement to the
Securities Act ............................................................ 33

C.   Knowledge is Not Required by Sections 11 or 12(a)(2)............. 34

D.   Defendants Violated Item 303(a) of SEC Regulation S-K ......... 36

E.   The Registration Statement and Prospectus Contained False
and Misleading Statements and Omissions................................. 37

IV.   Each of the Defendants is Liable Under Section 12(a)(2) ..................... 37

CONCLUSION................................................................................. 38

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*In re Able Labs. Sec. Litig.*,
   No. 05-2681, 2008 U.S. Dist. LEXIS 23538 (D.N.J. Mar. 24, 2008).....................................21

*In re Am. Express Co. Sec. Litig.*,
   No. 02-5533, 2008 U.S. Dist. LEXIS 74372 (S.D.N.Y. Sept. 26, 2008)................................16

*In re Am. Serv. Grp., Inc.*,
   No. 06-0323, 2009 U.S. Dist. LEXIS 28237 (M.D. Tenn. Mar. 31, 2009) ............................23

*In re AOL Time Warner, Inc. Sec. Litig.*,
   503 F. Supp. 2d 666 (S.D.N.Y. 2007).....................................................................................29

*In re APAC Teleservices, Inc. Sec. Litig.*,
   No. 97-9145, 1999 U.S. Dist. LEXIS 17908 (S.D.N.Y. Nov. 19, 1999)................................38

*Arista Records, LLC v. Doe 3*,
   604 F.3d 110 (2d Cir. 2010).....................................................................................................30

*Arkansas Public Employees Retirement System v. GT Solar International, Inc.*,
   No. 08-cv-312, 2009 U.S. Dist. LEXIS 93820 (D. N.H. Oct. 7, 2009) .......................10, 12, 35

*In re ArthroCare Corp. Sec. Litig.*,
   726 F. Supp. 2d 696 (W.D. Tex. 2010).....................................................................................21

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009) .............................................................................................................30

*In re AstraZeneca Sec. Litig.*,
   559 F. Supp. 2d 453 (S.D.N.Y. 2008)......................................................................................23

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004)...........................................................................15, 16, 19

*In re Axis Capital Holdings Ltd. Sec. Litig.*,
   456 F. Supp. 2d 576 (S.D.N.Y. 2006)......................................................................................33

*Backe v. Novatel Wireless, Inc.*,
   642 F. Supp. 2d 1169 (S.D. Cal. 2009).........................................................................11, 12, 19

*In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*,
   757 F. Supp. 2d 260 (S.D.N.Y. 2010)...........................................................................31, 32

*Batwin v. Occam Networks, Inc.*,
    No. 07-2750, 2008 U.S. Dist. LEXIS 52365 (C.D. Cal. July 1, 2008)............................20, 23

*In re Beacon Assocs. Litig.*,
    745 F. Supp. 2d 386 (S.D.N.Y. 2010)......................................................................................29

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)...........................................................................................7, 30, 35

*In re BellSouth Corp. Sec. Litig.*,
    355 F. Supp. 2d 1350 ..............................................................................................................34

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2007) .............................................................................................10, 19

*In re Bradley Pharm., Inc. Sec. Litig.*,
    421 F. Supp. 2d 822 (D.N.J. 2006) .........................................................................................29

*Briarwood Invs. Inc. v. Care Inv. Trust Inc.*,
    No. 07-8159, 2009 U.S. Dist. LEXIS 18963 (S.D.N.Y. March 4, 2009) ................................38

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
    No. 10-7498, 2012 U.S. Dist. LEXIS 46202 (S.D.N.Y. Mar. 30, 2012) ..........................13, 27

*Brumbaugh v. Wave Sys. Corp.*,
    416 F. Supp. 2d 239 (D. Mass. 2006) .....................................................................................29

*In Re Cabletron Sys.*,
    311 F.3d 11 (1st Cir. 2002)......................................................................................................23

*In re Cardinal Health, Inc. Sec. Litig.*,
    426 F. Supp. 2d 688 (S.D. Ohio 2006) ...................................................................................21

*In re Catalina Marketing Corporation Securities Litigation*,
    390 F. Supp. 2d 1110 (M.D. Fl. 2005).................................................................................10, 12

*Charter Twp. of Clinton Police & Fire Ret. Sys. v. KKR Fin. Holdings LLC*,
    No. 08-7062, 2010 U.S. Dist. LEXIS 122127 (S.D.N.Y. Nov. 17, 2010).............................32

*In re CitiGroup, Inc. Bond Litig.*,
    723 F. Supp. 2d 568 (S.D.N.Y. 2010).....................................................................................31

*Citiline Holdings, Inc. v. iStar Fin'l, Inc.*,
    701 F. Supp. 2d 506 (S.D.N.Y. 2010).....................................................................................32

*City of Roseville Employees' Retirement System v. Nokia Corporation*,
    No. 10-967, 2011 U.S. Dist. LEXIS 101264 (S.D.N.Y. Sept. 6, 2011)...................................17

*City of Sterling Heights Police and Fire Ret. Sys. v. Abbey National, PLC*,
    423 F. Supp. 2d 348 (S.D.N.Y. 2006) ...................................................................................19

*Clal Fin. Batucha Inv. Mgmt., Ltd. v. Perrigo Co.*,
    No. 09-2255, 2010 U.S. Dist. LEXIS 105185 (S.D.N.Y. Sept. 30, 2010) .............................14

*Cosmas v. Hassett*,
    886 F.2d 8 (2d Cir. 1989) .....................................................................................................19

*CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*,
    654 F.3d 276 (2d Cir. 2011) .................................................................................................22

*In re Daou Sys., Inc. Sec. Litig.*,
    397 F.3d 704 (9th Cir. 2005) .........................................................................................20, 23

*In re Deutsche Telekom AG Sec. Litig.*,
    No. 00-9475, 2002 U.S. Dist. LEXIS 2627 (S.D.N.Y. Feb. 20, 2002)...................................38

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005).......................................................................................................26, 28

*In re Dynex Capital, Inc.*,
    No. 05-1897, 2009 U.S. Dist. LEXIS 96527 (S.D.N.Y. Oct. 19, 2009).................................19

*ECA and Local 134 IBEW Joint Pension Trust of Chi.*,
    553 F.3d 187, 206 (2d Cir. 2009).....................................................................................13, 20

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    131 S. Ct. 2179 (2011)...........................................................................................................7

*In re eSpeed, Inc. Sec. Litig.*,
    457 F. Supp. 2d 266 (S.D.N.Y. 2006)....................................................................................38

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    352 F. Supp. 2d 429 (S.D.N.Y. 2005)....................................................................................38

*Frank v. Dana Corp.*,
    646 F.3d 954 (6th Cir. 2011) ...............................................................................................24

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)...............................................................................21, 22

*Friedberg v. Discreet Logic*,
    959 F. Supp. 42 (D. Mass. 1997) ..........................................................................................20

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)..................................................................................................19

*George v. China Auto. Sys.*,
   No. 11-7533, 2012 U.S. Dist. LEXIS 111730 (S.D.N.Y. Aug. 8, 2012)...............................22

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011).......................................................................16, 17, 23

*Goldman v. Belden*,
   754 F.2d 1059 (2d Cir. 1985)............................................................................................7

*Greenapple v. Detroit Edison Co.*,
   618 F.2d 198 (2d Cir. 1980)............................................................................................38

*Hall v. The Children's Place Retail Stores, Inc.*,
   580 F. Supp. 2d 212 (S.D.N.Y. 2008)..............................................................................23

*Heller v. Goldin Restructuring Fund, L.P.*,
   590 F. Supp. 2d 603 (S.D.N.Y. 2008)..............................................................................29

*Helwig v. Vencor, Inc.*,
   251 F.3d 540 (6th Cir. 2001) ..........................................................................................21

*Herman & MacLean v. Huddlesteon*,
   459 U.S. 375 (1983)........................................................................................................34

*Hutchison v. Deutsche Bank Sec., Inc.*,
   647 F.3d 479 (2d Cir. 2011).............................................................................................36

*In re IAC/Interactivecorp Sec. Litig.*,
   695 F. Supp. 2d 109 (S.D.N.Y. 2010)........................................................................31, 32

*In re Infosonics Corp. Derivative Litig.*,
   No. 06-136, 2007 U.S. Dist. LEXIS 66043 (S.D. Cal. Sept. 4, 2007)....................................21

*In re Initial Pub. Offering Sec. Litig.*,
   358 F. Supp. 2d 189 (S.D.N.Y. 2004)..............................................................................37

*Institutional Investors Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009).............................................................................................24

*Iowa Pub. Emps' Ret. Sys. v. MF Global, Ltd.*,
   620 F.3d 137 (2d Cir. 2010).......................................................................................26, 37

*In re IPO Sec. Litig.*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003)..............................................................................34

*In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*,
   No. 10-8323, 2012 U.S. Dist. LEXIS 65754 (S.D.N.Y. May 4, 2012) ....................................13

*Jones v. Corus Bankshares, Inc.*,
  701 F. Supp. 2d 1014 (N.D. Ill. 2010) .................................................................13

*In re JPMorgan Chase Sec. Litig.*,
  363 F. Supp. 2d 595 (S.D.N.Y. 2005) .................................................................34

*Lapin v. Goldman Sachs Group, Inc.*,
  506 F. Supp. 2d 221 (S.D.N.Y. 2006) .................................................................13

*In re Lehman Bros. Sec. Fraud Litig.*,
  799 F. Supp. 2d 258 (S.D.N.Y. 2011) ...........................................................14, 28

*Lentell v. Merrill Lynch & Co. Inc.*,
  396 F.3d 161 (2d Cir. 2005) ................................................................................29

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir. 2011) ................................................................................36

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ..............................................................................27

*Maldonado v. Fontanes*,
  568 F.3d 263 (1st Cir. 2009) ...............................................................................16

*Malin v. XL Capital Ltd.*,
  499 F. Supp. 2d 117 (D. Conn. 2007) .................................................................21

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
  927 F. Supp. 1297 (C.D. Cal. 1996) ..............................................................20, 23

*Middlesex Ret. Sys. v. Quest Software, Inc.*,
  No. 06-6863, 2008 U.S. Dist. LEXIS 68419 (C.D. Cal. July 10, 2008) ................23

*Milman v. Box Hill Sys. Corp.*,
  72 F. Supp. 2d 220 (S.D.N.Y. 1999) ...................................................................37

*In re Moody's Corp. Sec. Litig.*,
  599 F. Supp. 2d 493 (S.D.N.Y. 2009) .................................................................14

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010) ................................................................................37

*In re Nat'l Golf Props., Inc. Sec. Litig.*,
  No. 02-1383, 2003 U.S. Dist. LEXIS 4321 (C.D. Cal. Mar. 19, 2003) ................38

*Nathel v. Siegal*,
  592 F. Supp. 2d 452 (S.D.N.Y. 2008) .................................................................27

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
__ F.3d __, 2012 U.S. App. LEXIS 18814 (2d Cir. 2012) .................................................7, 30

*No. 84 Emp'r-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2002) ...............................................................................................23

*In re NovaGold Res. Inc. Sec. Litig.*,
629 F. Supp. 2d 272 (S.D.N.Y. 2009)...................................................................................30

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000).............................................................................................15, 16

*In re Oxford Health Plans, Inc. Sec. Litig.*,
187 F.R.D. 133 (S.D.N.Y. 1999) .................................................................................20, 21, 24

*Panther Partners Inc. v. Ikanos Commcn's, Inc.*,
681 F.3d 114 (2d Cir. 2012)....................................................................................... *passim*

*Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*,
940 F. Supp. 1101 (W.D. Mich. 1996) .................................................................................38

*In re Proxima Corp. Sec. Litig.*,
No. 93-1139, 1994 U.S. Dist. LEXIS 21443 (S.D. Cal., May 3, 1994)................................38

*In re Qwest Communs. Int'l, Inc. Sec. Litig.*,
396 F. Supp. 2d 1178 (D. Colo. 2004)..................................................................................20

*In re Refco, Inc. Sec. Litig.*,
503 F. Supp. 2d 611 (S.D.N.Y. 2007)..............................................................................31, 32

*Ret. Sys. v. Lockheed Martin Corp.*,
No. 11-5026, 2012 U.S. Dist. LEXIS 97185 (S.D.N.Y. July 13, 2012) ................................19

*Ret. Sys. v. Merrill Lynch & Co., Inc.*,
No. 08-9063 (S.D.N.Y. Feb. 19, 2009)..................................................................................34

*Richman v. Goldman Sachs Group, Inc.*,
No. 10-3461, 2012 U.S. Dist. LEXIS 86556 (S.D.N.Y. June 21, 2012) ...............................26

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)............................................................................................33, 37

*Ross v. Abercrombie & Fitch Co.*,
501 F. Supp. 2d 1102 (S.D. Oh. 2007) .................................................................................20

*Rothman v. Gregor*,
220 F.3d 81 (2d Cir. 2000).....................................................................................................19

*In re Sadia, S.A. Sec. Litig.*,
    643 F. Supp. 2d 521 (S.D.N.Y. 2009)......................................................................23

*Schaffer v. Evolving Sys., Inc.*,
    29 F. Supp. 2d 1213 (D. Colo. 1998)......................................................................38

*In re Scottish Re Group Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007).............................................................23, 34

*In re SeeBeyond Techs. Corp. Sec. Litig*,
    266 F. Supp. 2d 1150 (C.D. Cal. 2003) ..................................................................20

*In re Spyglass, Inc. Sec. Litig.*,
    No. 99-512, 1999 U.S. Dist. LEXIS 11382 (N.D. Ill. July 20, 1999).....................20

*In re Stac Elecs. Sec. Litig.*,
    89 F.3d 1399 (9th Cir. 1996) ..................................................................................33

*Steed Fin. LDC v. Nomura Sec. Int'l Inc.*,
    No. 00-8058, 2001 U.S. Dist. LEXIS 14761 (S.D.N.Y. Sept. 20, 2001)................38

*Stocke v. Shuffle Master, Inc.*,
    615 F. Supp. 2d 1180 (D. Nev. 2009)......................................................................21

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006).............................................................................20, 21

*In re Syncor Int'l Corp. Sec. Litig.*,
    327 F. Supp. 2d 1149 (C.D. Cal. 2004) ..................................................................24

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008).....................................................................................14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).......................................................................................... *passim*

*In re Top Tankers, Inc. Sec. Litig.*,
    528 F. Supp. 2d 408 (S.D.N.Y. 2007)......................................................................14

*Twinlab Corp. Sec. Litig.*,
    103 F. Supp. 2d 193 (E.D.N.Y. 2000) .....................................................................33

*Tyler v. Liz Claiborne, Inc.*,
    814 F. Supp. 2d 323 (S.D.N.Y. 2011)......................................................................17

*In re UTStarcom, Inc. Sec. Litig.*,
    617 F. Supp. 2d 964 (N.D. Cal. 2009) .....................................................................21

*Va. Bankshares v. Sandberg*,
    501 U.S. 1083 (1991)................................................................................13

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
    672 F. Supp. 2d 596 (S.D.N.Y. 2009)......................................................23

*In re Vivendi Universal, S.A. Sec. Litig.*,
    765 F. Supp. 2d 512 (S.D.N.Y. 2011).................................................27, 28

*In re Wachovia Equity Sec. Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011).......................................................31

*In re Worldcom, Inc. Sec. Ltig.*,
    No. 02-3288, 2004 U.S. Dist. LEXIS 11696 (S.D.N.Y. June 29, 2004) ..........................30, 32

STATUTES, REGULATIONS, AND RULES

15 U.S.C. § 77k (Section 11 of the Securities Act of 1933) .................................... *passim*

15 U.S.C. § 77l (Section 12 of the Securities Act of 1933) .................................... *passim*

15 U.S.C. § 78j (Section 10(b) of the Securities Exchange Act of 1934) ........................... *passim*

15 U.S.C. §§ 78u-4 (Private Securities Litigation Reform Act)................................7, 8, 13, 26, 34

15 U.S.C. § 78p(a) ...................................................................................22

Sarbanes-Oxley Act of 2002 ........................................................................4, 8

17 C.F.R. § 229.303 ..................................................................................36

17 C.F.R. § 240.10b5-1 ...............................................................................22

Fed. R. Civ. P. 8 ................................................................................ *passim*

Fed. R. Civ. P 9 ................................................................................. *passim*

Fed. R. Civ. P. 12 .................................................................................7, 27

The Plumbers and Pipefitters National Pension Fund ("Plaintiff") respectfully submits this memorandum of law in opposition to (1) the Motion by Defendant IntraLinks Holdings, Inc., the Officer Defendants and the Director Defendants to Dismiss Lead Plaintiff's Consolidated Class Action Complaint and (2) the Underwriter Defendants' Motion to Dismiss the Consolidated Class Action Complaint, which joined in the other Defendants' motion and brief.

## PRELIMINARY STATEMENT

This is a class action alleging both securities fraud claims under the Securities Exchange Act of 1934 (the "Exchange Act") and non-fraud claims under the Securities Act of 1933 (the "Securities Act"). Between February 17, 2011 and November 11, 2011 (the "Class Period"), Defendants repeatedly touted IntraLinks' financial performance but never disclosed critical information to investors, including that the Federal Deposit Insurance Corporation ("FDIC"), which was IntraLinks' largest customer by far and accounted for substantial revenues of its supposedly fastest growing business segment, the Enterprise business, had decided not to renew its contract with IntraLinks. The Exchange Act Defendants also concealed the drastic overbilling of customers as well as a scheme to inflate the financial results of the Enterprise segment by misclassifying revenue properly belonging to other business segments. The seriousness of these allegations is further underscored by the fact that IntraLinks is now the target of an investigation by the Securities and Exchange Commission ("SEC").

In their motions to dismiss, Defendants do not even address many of the statements alleged in the Consolidated Class Action Complaint ("Complaint") to be false and misleading. Instead, their primary argument on the issue of falsity – and the centerpiece of their defense – is that IntraLinks did not "lose" the FDIC as a customer because IntraLinks continued to perform some work for the FDIC after the end of the Class Period. However, there is absolutely no question that when the FDIC announced in November 2011 that it would use a different service

1

provider for *all* new projects going forward, it said IntraLinks would be used only to wrap-up work on existing projects.   Moreover, as discussed *infra,* the FDIC had previously informed IntraLinks that it would not renew its contract and then issued a request for proposals ("RFP") to find another vendor, ceasing shortly thereafter executing task orders for new projects.  Thus, the date on which IntraLinks finally stopped working on FDIC projects accordingly has no relevance here.  Consequently, the very basis of Defendants' motions to dismiss is mistaken and irrelevant.

Moreover, the inference that the Exchange Act Defendants (IntraLinks, Andrew Damico, and Anthony Plesner) knew of the FDIC's impending departure when they made their misrepresentations, or were reckless as to the truth of that fact, is at least as strong as any non-culpable inference.  The Complaint alleges that the FDIC directly informed IntraLinks that it would not renew its contract and would instead find another service provider, after which the RFP was issued, and approximately one month later, the last task order was executed with IntraLinks.  Defendants Damico and Plesner also had the motive and opportunity to benefit from the fraud as each sold millions of dollars in stock during the Class Period, shortly before the revelation of negative information which decimated the price of IntraLinks' stock.

Likewise, Defendants' challenges to Plaintiff's Securities Act claims should be rejected. Their arguments for applying a stricter pleading standard to the Section 11 and 12(a)(2) claims are totally incorrect, and in addition, irrelevant as the Complaint is adequate under either standard.   Finally, regardless of which standard is applied, Defendants' argument that the application of the Rule 9(b) pleading standard somehow adds the element of scienter to the statute is nonsensical and without any basis in law.  In sum, there can be no serious dispute that Plaintiff's allegations are plausible and sufficient to state claims against the Exchange Act and Securities Act Defendants for violations of the Exchange Act and Securities Act, respectively. Accordingly, Defendants' motions should be denied in their entirety.

## FACTUAL BACKGROUND[1]

IntraLinks is a provider of virtual data rooms ("VDR") which are secure web-based workspaces that customers can use to present sensitive information to other entities. ¶¶ 3, 76.[2] Since its inception, IntraLinks concentrated its business on providing VDR services in two areas, mergers and acquisitions ("M&A") and debt capital markets ("DCM"). ¶¶ 4, 79, 88. The vast majority of IntraLinks' sales were short-term transactional and subscription contracts lasting three to twelve months. ¶¶ 4, 79-81. IntraLinks did maintain a small number of long term customers. However, each of those long-term customers used IntraLinks' services in a series of short-term transactions which were classified as either M&A or DCM contracts. ¶ 4.

Things began to change in 2009. After two unsuccessful attempts at taking the Company public, IntraLinks began making preparation for its third attempt at an IPO. ¶¶ 5-6, 82. In connection with its effort to meet the financial and regulatory requirements for an IPO, IntraLinks began an aggressive push to create the appearance of longer-term and more diversified revenue sources. ¶¶ 6, 83, 123-24. As part of this push, IntraLinks created a new business segment called "Enterprise," which purportedly included only those entities that maintained long-term document hosting and storage subscriptions with IntraLinks. ¶¶ 7, 87, 256.

Thereafter, commencing with and continuing during the Class Period, the Exchange Act Defendants falsely touted IntraLinks' financial strength and strong position especially with regard to its Enterprise segment, which seemingly was flourishing. ¶¶ 126-28. As part of its aggressive growth strategy, the Exchange Act Defendants consistently reported exponential financial performance and "significant growth" in IntraLinks' Enterprise segment and claimed that the Enterprise market was the Company's "largest and fastest growing market." ¶¶ 166-201.

---

[1] While Plaintiff's Exchange Act and Securities Act allegations are set forth in separate sections of the Complaint, rather than include separate factual backgrounds in the brief for these claims, Plaintiff has, for efficiency purposes, included cites to both the Exchange Act and Securities Act allegations in this section where appropriate.

[2] All references in the format "¶__" are to paragraphs within the Complaint.

3

These Defendants also falsely certified, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), that IntraLinks' SEC filings fairly presented "the financial condition and results of operations of IntraLinks" and that the filings did not contain any untrue statements or omissions.  ¶¶ 174-75, 177, 191, 199, 201.

Also during the Class Period, on April 4, 2011, IntraLinks conducted a Secondary Offering through which it raised $30 million for the Company and an additional $152.2 million for selling shareholders, including Defendants Damico and Plesner.  ¶¶ 136-38, 251.  The Underwriter Defendants were the underwriters for the Secondary Offering.  ¶¶ 55-63. IntraLinks' Registration Statement and Prospectus used in connection with the Secondary Offering contained numerous representations about the strength and growth of the Enterprise segment and also claimed that IntraLinks' "customers have a high level of satisfaction" with corresponding high renewal rates.  ¶¶ 178-82, 273-74, 287-93.  Seven directors of IntraLinks, as well as Damico and Plesner, signed the Registration Statement and are named as Defendants in the Complaint. ¶¶ 45-54.   (These defendants, together with the Underwriter Defendants, constitute the Securities Act Defendants.)

However, it has now been revealed that Defendants' public representations touting IntraLinks' Enterprise segment and the supposed satisfaction of IntraLinks' customers – including such representations in the Secondary Offering materials – were indisputably false and misleading because they omitted numerous pieces of material information.  First and foremost, Defendants failed to disclose that IntraLinks' largest customer, the FDIC – which in 2009 and 2010 accounted for 23.5% and 15.7% of IntraLinks' Enterprise revenue, respectively, and 7% of IntraLinks' total yearly revenue in 2010 – had informed IntraLinks that it would not renew its contract with IntraLinks which had been in effect since 2000 but would instead seek a new vendor for the provision of VDR services.  ¶¶ 13, 104-06, 264-65, 269.  As a result, in July 2010,

the FDIC put out an RFP seeking bids on a new VDR contract.  ¶¶ 106, 266.  The FDIC also stopped executing new task orders with IntraLinks after September 1, 2010; after that point, the FDIC only extended existing task orders in order to complete existing projects, but did not execute any new task orders.  Defendants, however, never disclosed to investors that IntraLinks' largest customer would soon end its relationship with IntraLinks.  Ultimately, the FDIC disclosed that it was changing its VDR provider.  On November 7, 2011, the FDIC announced that "[b]eginning in November 2011, the FDIC will begin using the RR Donnelley VDR known as Venue instead of IntraLinks for all new projects."  ¶¶ 150, 280.  The FDIC also explained that "IntraLinks will host projects initiated before November 2011 until they are resolved."  *Id*. Consistent with that announcement, IntraLinks continued to do a limited amount of work for the FDIC until after the end of the Class Period in order to wind-down existing projects.

Second, the Exchange Act Defendants failed to disclose to the investing public that IntraLinks had been misclassifying revenue in order to make the Enterprise segment appear stronger than it actually was.  Shortly after the creation of the Enterprise segment, IntraLinks began reporting large amounts of M&A and DCM revenue as Enterprise revenue.  ¶¶ 89-96. Indeed, the vast majority of the Enterprise revenue was M&A and DCM revenue that had been misclassified or intentionally reclassified.  ¶ 96.  By shifting revenue to Enterprise, the Exchange Act Defendants created the false impression that the Company's most important business segment, which promised long-term revenues, was experiencing excellent financial success.

Third, the Exchange Act Defendants failed to disclose to investors that IntraLinks' reported revenues were grossly inflated because of IntraLinks' antiquated billing system which had been overbilling customers by as much as 20 to 30%.  In the middle of 2009, IntraLinks finally sought to update its accounting system, but in the implementation process, it was discovered that the existing system had been drastically overbilling customers, and this fact was

communicated directly to IntraLinks senior management.  ¶ 118.  As a result, the new accounting system that had uncovered this error was never implemented.  *Id*.

Eventually, the truth about the loss of the FDIC contract and IntraLinks' declining Enterprise business – which was supposed to be IntraLinks' largest and fastest growing market and the future growth and success of the Company – was disclosed to the public through a series of partial disclosures, and the market reaction to each of these disclosures was swift and severe. First, on May 11, 2011, Defendant Damico made a partial disclosure when he revealed that an unnamed Enterprise customer would be significantly decreasing its IntraLinks usage over the remainder of the year.  ¶¶ 142, 276.  This partial disclosure caused the price of IntraLinks stock to drop by approximately 33%.  ¶ 220.  Then, on August 10, 2011, IntraLinks announced more bad news when it revealed that it had received a subpoena from the SEC.  ¶¶ 153, 281.  The understanding in the investment community and on investor message boards was that the SEC investigation related to the Secondary Offering, along with improper revenue recognition practices used by IntraLinks and statements made in the Company's 2010 Form 10-K and Secondary Offering materials.  ¶¶ 155-58, 282.  As a result of this disclosure, IntraLinks' stock lost almost half of its value, dropping by 45%.  ¶ 221.  On November 7, 2011, as discussed above, the FDIC announced that it had selected a new vendor for VDR services.  ¶¶ 150, 222, 280.  The next day, IntraLinks released its third quarter 2011 financial results in which it finally revealed the problems with its Enterprise business which had been hidden by IntraLinks' revenue misclassification and overbilling.  ¶¶ 159-63, 283.  As a result of these disclosures, IntraLinks' stock dropped again, this time from $8.79 per share to $4.80 per share.  ¶ 223.  Overall, these disclosures caused IntraLinks' stock to fall by a staggering 83% and destroyed over $1 billion in market capitalization.  ¶ 224.  Following these disclosures, both Defendants Damico and Plesner left IntraLinks.  ¶ 164.

## ARGUMENT

### I.     Legal Standard

The Supreme Court's decision in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), reaffirms that, for motions to dismiss securities fraud actions, courts must accept the factual allegations in a plaintiff's complaint as true and draw all reasonable inferences in a plaintiff's favor on a Rule 12(b)(6) motion to dismiss.  *See id.* at 322.  The same is true of actions pleading violations of the Securities Act.  *See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, __ F.3d __, 2012 U.S. App. LEXIS 18814, at *3 n.1 (2d Cir. 2012).  Significantly, a court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient."  *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (complaint must provide "plausible grounds" with "enough fact to raise a reasonable expectation that discovery will reveal evidence" to support them).

### II.    The Complaint States a Claim under Section 10(b) and Rule 10b-5 of the Exchange Act

To establish a claim under Section 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must demonstrate (1) a misrepresentation or omission of material fact, (2) scienter, (3) in connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation.  *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011).

Claims under Section 10(b) and Rule 10b-5 are subject to the pleading standards of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA").  Under Rule 9(b), the complaint must "state with particularity the circumstances constituting fraud[.]"  Fed. R. Civ. P. 9(b). Under the PSLRA, the complaint must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading" and "state with

particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. §§ 78u-4(b)(1), (2).

    **A.**    **The Complaint Adequately Alleges that the Exchange Act Defendants Made False and/or Misleading Statements**

The Complaint alleges that during the Class Period, the Exchange Act Defendants made numerous misstatements (1) touting the supposed strength, growth, and success of IntraLinks' Enterprise segment, (2) providing overly aggressive projections of increases in 2011 revenue, based on the growth of the Company's Enterprise business, (3) claiming that IntraLinks' customers had a "high level of satisfaction" which led to high renewal rates ("104% renewal rate, on a per-customer absolute dollar commitment basis" in 2010, ¶ 172), and (4) certifying, pursuant to SOX, that IntraLinks' SEC filings fairly presented "the financial condition and results of operations of IntraLinks" and that the filings did not contain any untrue statements or omissions, ¶¶ 130-35, 138-39, 166-201.  Throughout this time, however, the Exchange Act Defendants failed to disclose the fact that IntraLinks would soon lose its largest customer, the FDIC, whose business had fueled the Company's and, in particular, the Enterprise segment's earnings growth, and which had previously sought unsuccessfully to renegotiate its contract given the cost of IntraLinks' services, and that this would have an extremely damaging impact on IntraLinks' revenue going forward.  *Id.*; *see also* ¶ 110.  They also failed to disclose that IntraLinks was misclassifying revenue as Enterprise revenue when it was more properly categorized as M&A or DCM revenue, in order to make the Enterprise business – IntraLinks' most important business segment and the supposed future of the Company – seem more successful than it actually was.  *Id.*  Further, the Exchange Act Defendants failed to disclose the problems IntraLinks was having with its Enterprise sales force, and that the Company overbilled customers.  *Id.*

### 1.    Failure to Disclose the Loss of the FDIC

In the falsity section of their brief, Defendants do not address **any** of the statements alleged to be false or misleading in the Complaint.   *See* Memo. of Law in Supp. of the Mot. by Defs' IntraLinks Holdings, Inc., the Officer Defs. and the Director Defs. to Dismiss Lead Pl.'s Consol. Class Action Compl. ("Defs' Br.") at 9-12.   Rather, their sole argument on the issue of falsity is narrow and factual.   They argue generally that their statements were accurate because IntraLinks continued to do some work for the FDIC after the end of the Class Period.   *Id*. at 11. Specifically, Defendants argue that since the final expiration date set forth in Task Order 16 was extended, on May 27, 2011, from June 2011 until March 2012, it is not true "that IntraLinks 'lost' the FDIC as a customer."   *Id*. at 12.   But it is absolutely true that IntraLinks lost the FDIC as a customer—and the date on which IntraLinks ultimately stopped working on pre-existing FDIC projects is wholly irrelevant to that fact.   The FDIC's November 7, 2011 public announcement that it was changing VDR providers plainly states:

> Beginning in November 2011, the FDIC will begin using the RR Donnelley VDR known as Venue *instead of IntraLinks for all new projects*.   IntraLinks will host projects initiated before November 2011 until they are resolved.

¶ 150 (emphasis added).

From this, it is clear that (1) the FDIC was switching to a new VDR provider "for all new projects" and (2) the FDIC would only use IntraLinks to wind-down existing projects. IntraLinks indisputably lost the FDIC as a customer, and the fact that FDIC allowed IntraLinks to tie up loose ends on pre-existing projects does not change that.   Moreover, as discussed below, the FDIC had previously informed IntraLinks that it would search for a new vendor, and then issued the RFP.   Defendants' myopic focus on the final end-date of the Task Order misses the larger point that the FDIC issued an RFP after IntraLinks refused to renegotiate their contract and then formally selected another provider "for all new projects."

Under very similar circumstances, several courts have held that the failure to disclose the impending loss of a major customer renders statements similar to the Exchange Act Defendants' false and misleading.  For example, in *In re Catalina Marketing Corporation Securities Litigation*, 390 F. Supp. 2d 1110 (M.D. Fl. 2005), the plaintiffs alleged that the defendants "touted the success of" its UK business segment "while failing to disclose that a material contract . . . which constituted a significant portion of [the UK segment's] revenues had been canceled." *Id*. at 1114 (internal quotation marks omitted).  The company "failed to disclose the loss of its largest European customer for more than a year, all the while publically expressing confidence in the European operations." *Id*.  The court held that "statements praising the success of [the UK segment] while simultaneously failing to disclose the loss of its largest contract" were fraudulent. *Id*. at 1115.

Also, in *Arkansas Public Employees Retirement System v. GT Solar International, Inc.*, No. 08-cv-312, 2009 U.S. Dist. LEXIS 93820 (D. N.H. Oct. 7, 2009), shortly after the defendant company's IPO was complete, the company's largest customer announced that it had signed a contract to purchase products from a competitor. *Id*. at *3.  However, the company's registration statement had failed to disclose the substantial likelihood that the customer would leave for another supplier. *Id*. at *25-26.  The court held several of the defendants' statements misleading, including statements that the company's primary product "is a market leading product" and is "the most widely used furnace . . . in the solar industry" – statements similar to Defendants' statements touting the strength of the Enterprise segment. *Id*. at *29-37; *compare* ¶¶ 173-74, 178, 181-82, 188-90, 196, 198.  Likewise, the *GT Solar* defendants' false statement that their products "promotes recurring sales of additional equipment" is similar to Defendants' assurances that IntraLinks' customers "high level of satisfaction" led to high renewal rates. *Id*. at *37; *compare* ¶ 180.  *See also Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 984, 987 (9th Cir.

2007) (defendants' touting of company's work yet to be performed was fraudulent where defendants failed to disclose that two customers had issued stop-work orders); *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1174-75, 1181 (S.D. Cal. 2009) (statements touting performance of USB modem business were false and misleading because they failed to disclose that "one of the Company's largest customers, Sprint, would discontinue all further orders of the Company's popular 720 USB card").[3]

### 2.     Failure to Disclose IntraLinks' Misclassification of Revenue or the Overbilling of Customers

The statements challenged in the Complaint were false and misleading for the separate and additional reason that they failed to disclose that IntraLinks was misclassifying revenue.  In order to create the appearance of growth in the Enterprise business, IntraLinks improperly reported large amounts of M&A and DCM revenue as Enterprise revenue.  ¶¶ 89-96.  Indeed, the vast majority of the Enterprise revenue was misclassified.  ¶ 96.  The Exchange Act Defendants touted the supposed success of the Enterprise segment but failed to disclose this practice which accounted for much of the supposed growth.  They also concealed the fact that their antiquated billing system had been overbilling customers by as much as 20 to 30 percent, resulting in a corresponding inflation of reported revenues.  ¶ 118.

In the falsity section of their brief, the Exchange Act Defendants do not address the allegations of misclassified revenues or overbilling.  Defs' Br. at 9-12.  Instead, in the scienter section of their brief, they raise multiple arguments ostensibly challenging scienter, but which

---

[3] Notably, the court in *Backe* expressly rejected an argument similar to one advanced by Defendants here.  The *Backe* defendants had argued that their statements were not false because "Sprint did not in fact cancel orders, but transitioned from the 720 USB modem to a new Novatel product line."  *Id.* at 1181.  However, it was undisputed that Sprint had stopped ordering the 720 modem, so the defendants had not shown "that Plaintiff's allegations of a cancellation [we]re inherently implausible or false."  *Id.*

actually appear to address falsity.  *Id*. at 20-22.[4]  First, they argue that the FDIC revenue was properly classified as Enterprise revenue because it was subscription-based.  *Id*. at 20.  The Complaint makes clear, however, that the services offered and products purchased under the FDIC's agreement were a series of DCM transactions, not a long-term repository, and therefore should have been classified as DCM revenue.  ¶ 95.  Second, Defendants argue that the statements that the Enterprise market was IntraLinks' "largest and fastest growing market" were not misleading because Plaintiff does not show "which reported figures about IntraLinks' Enterprise revenue were incorrect."  Defs' Br. at 20-21.  But Plaintiff need not do so in order to plead falsity.  These statements concealed the fact that the FDIC – which accounted for 7% of IntraLinks' overall company revenue in 2010 and 15.7% of Enterprise revenue that year – had already decided to find another vendor, that most of the Enterprise revenue was misclassified, and that significant portions of Company revenues were the result of overbilling.  Other courts have held similar statements to be false and misleading under analogous circumstances.  *See, e.g.*, *Catalina*, 390 F. Supp. 2d at 1114 (statements "tout[ing] the success" of business segment were fraudulent); *GT Solar*, 2009 U.S. Dist. LEXIS 93820, at *36-37 (statements that the company's product "is a market leading product" and is "the most widely used furnace . . . in the solar industry" were fraudulent); *Backe*, 642 F. Supp. 2d at 1174 (statements "the market for 3G Wireless is taking off" and "[w]e certainly see strong demand" were fraudulent).

Equally unpersuasive is Defendants' contention that two of the many statements challenged in the Complaint constitute inactionable puffery.  Defs' Br. at 21.  Taken in context, these statements are sufficiently specific to avoid classification as puffery.  In particular, the statement that "[w]e believe that we have a significant opportunity to increase our market share

---

[4] To the extent Defendants really intended these arguments to address scienter, the arguments are incomprehensible, and in any event baseless; they therefore should be ignored.

in these core markets" must be considered in relation to the sentence preceding it, which falsely represented that "[t]oday, the Enterprise principal market is our largest and fastest growing market."  ¶ 182; *see Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1027 (N.D. Ill. 2010) ("[C]ontext must be taken into account in determining whether a given statement or set of statements qualifies as puffery . . .  even where a statement is not actionable when considered individually, it can be actionable if it 'reinforce[s] factual misstatements and therefore contribute[s] to ongoing deception.'").  Although the statement was not expressed in terms of "dollars and cents," it need not be because "such conclusory terms in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading."  *Va. Bankshares v. Sandberg*, 501 U.S. 1083, 1093 (1991).[5] Moreover, the Complaint adequately alleges that the Exchange Act Defendants did not believe their statements, which renders them actionable.  *See Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 239 (S.D.N.Y. 2006) ("optimistic statements may be actionable upon a showing that the defendants did not genuinely or reasonably believe the positive opinions they touted").[6]

**B.**  **The Complaint Adequately Alleges that the Exchange Act Defendants' False and/or Misleading Statements Were Made with Scienter**

**1.**  **The Requirements for Pleading Scienter**

Under the PSLRA, a complaint alleging violations of Section 10(b) of the Exchange Act must state "facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  A strong inference of scienter arises if, "[w]hen the

---

[5] In contrast, in the cases on which Defendants rely, the statements held to be puffery were much more general.  *See ECA and Local 134 IBEW Joint Pension Trust of Chi.*, 553 F.3d 187, 206 (2d Cir. 2009) (statements were simply "generalizations regarding JPMC's business practices," *e.g.*, that it exercised "financial discipline"); *In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, No. 10-8323, 2012 U.S. Dist. LEXIS 65754 at *21-22 (S.D.N.Y. May 4, 2012) ("We're very focused on the outcomes for the students" and similar general statements were puffery).
[6] Finally, in "deeming a statement puffery at the motion to dismiss stage, courts must exercise great caution" because "materiality determinations entail delicate, fact-intensive assessments that are more properly left to the jury."  *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, No. 10-7498, 2012 U.S. Dist. LEXIS 46202, at *50-51 (S.D.N.Y. Mar. 30, 2012).

allegations are accepted as true and taken collectively," a reasonable person would "deem the inference of scienter at least as strong as any opposing inference[.]"  *Tellabs*, 551 U.S. at 326. The "inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun genre,' or even the 'most plausible of competing inferences.'"  *Id*. at 324; s*ee In re Top Tankers, Inc. Sec. Litig.*, 528 F. Supp. 2d 408, 413-14 (S.D.N.Y. 2007) ("[C]ourts since *Tellabs* have concluded that even if the plaintiff demonstrates only that an inference of scienter is at least as compelling as any nonculpable explanation for the defendants's conduct, the 'tie'… goes to the plaintiff'"").   Moreover, it is a holistic inquiry that court must undertake, that is, "courts must consider the complaint in its entirety . . . . The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs,* 551 U.S. at 322-23.

"[T]he requisite scienter can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."  *Clal Fin. Batucha Inv. Mgmt., Ltd. v. Perrigo Co.*, No. 09-2255, 2010 U.S. Dist. LEXIS 105185, at *21 (S.D.N.Y. Sept. 30, 2010). Under the "conscious misbehavior" theory, the plaintiff must show "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care[.]"  *Id*. at *21-22.  This standard is met where plaintiffs allege that defendants "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor."  *In re Lehman Bros. Sec. Fraud Litig.*, 799 F. Supp. 2d 258, 293 (S.D.N.Y. 2011).[7]

---

[7] The facts discussed in this section also establish scienter as to IntraLinks itself.  *See In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 516 (S.D.N.Y. 2009) ("[S]cienter by management-level employees is generally sufficient to attribute scienter to corporate defendants" and "the individual making an alleged misstatement and the one with scienter do not have to be one and the same."); *see also Teamsters Local 445 Freight Division Pension*

2.    **The Complaint Creates a Strong Inference of Scienter as to the FDIC's Impending Departure from IntraLinks**

a    **The FDIC Directly Informed IntraLinks that It Would Not Renew Its Contract and Issued an RFP**

The Complaint pleads numerous facts that cogently and plausibly demonstrate that the Exchange Act Defendants either knew or were reckless in not knowing of the FDIC's impending departure from IntraLinks.  In particular, the Complaint alleges that the FDIC sought to renegotiate its existing contract with IntraLinks but IntraLinks refused.  ¶¶ 15, 101.  IntraLinks' Executive Vice President, Robert Mullen, said there was "absolutely no way" IntraLinks would renegotiate with the FDIC.  ¶ 105.  Mullen's position was that "we're not changing the terms. We are going to put the screws to them."  *Id*.  In response, the FDIC informed IntraLinks that it would not be renewing its contract and would instead seek new bids.  *Id*.  And indeed, in July 2010, the FDIC distributed an RFP to VDR providers seeking new bids for VDR services.  ¶¶ 17, 106.[8]

Defendants criticize these allegations primarily on the grounds that they originate from a confidential witness, CW1.  *See* Defs' Br. at 15-20.  However, the Second Circuit permits the use of confidential witnesses so long as they are "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000); *see also In*

---

*Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194-95 (2d Cir. 2008) ("[a] plaintiff may . . . allege[] scienter on the part of a corporate defendant without pleading scienter against any particular employees of the corporation.").

[8] Defendants argue that "[e]ven Plaintiff admits that the FDIC's Acquisition Policy required it to engage in a competitive bid process."  Def. Br. at 18.  ***Actually, the Complaint alleges only that the FDIC Acquisition Policy "required that the price of any contract be competitive and reasonable" not that a competitive bid process was required or necessary***.  ¶ 103.  In fact, the FDIC's Acquisition Procedures, Guidance and Information ("PGI") document identifies circumstances where competition is not required including ***when an "existing Contractor offers the benefits of historical expertise or systems compatibility*** which other offerors cannot provide as cost-effectively or as timely[.]"  *See* PGI § 2.206(a)(2)(iii), available at http://www.fdic.gov/buying/goods/acquisition/apm/PGI.html (emphasis added).  But whether or not the FDIC had to issue the RFP, the fact that the FDIC did so meant, at the least, it was considering other vendors.

re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d 474, 493 (S.D.N.Y. 2004).[9]

CW1 satisfies the Novak standard. The Complaint alleges that CW1 was a Vice President of Sales at IntraLinks for four years. ¶ 71. CW1 managed sales representatives on the West Coast and reported to the executive vice president of sales until May 2009 and, after that, CW1 reported to the national sales manager who, in turn, reported directly to Robert Mullen. Id. Thus, CW1 was in a position to speak directly with Mullen about the FDIC contract negotiations. The allegations in the Complaint "support the probability" that CW1 possesses the information alleged. Novak, 216 F.3d at 314.

It is of no moment that CW1 left IntraLinks before the FDIC issued its RFP, because the contract discussions between IntraLinks and the FDIC began long before that point. Mullen's position at the time was firm and unwavering; as he expressed to CW1, there was "absolutely no way" IntraLinks would renegotiate with the FDIC. ¶ 105. Defendants speculate that in the intervening time period, the parties could have "change[d] course and renegotiate[d] without CW#1 knowing anything about it." Defs' Br. at 19. But that is not what occurred – the FDIC went ahead with its RFP and dropped IntraLinks. ¶¶ 17, 106. Defendants' inference that circumstances may have changed is directly contrary to the allegations in the Complaint and cannot be accepted. See Maldonado v. Fontanes, 568 F.3d 263, 271 (1st Cir. 2009) (rejecting defendants' desired inference where it was inconsistent with allegations in complaint).[10]

---

[9] Defendants contend that "courts often discount allegations by confidential witnesses[.]" Defs' Br. at 15 (citing In re Am. Express Co. Sec. Litig., No. 02-5533, 2008 U.S. Dist. LEXIS 74372, at *19-20 (S.D.N.Y. Sept. 26, 2008)). However, the court in American Express did not actually discount the confidential witness allegations. Rather, it noted that "several district courts in this circuit have considered allegations based on confidential sources after Tellabs" without discounting them." 2008 U.S. Dist. LEXIS 74372, at *20; see also Glaser v. The9, Ltd., 772 F. Supp. 2d 573, 590 n.12 (S.D.N.Y. 2011) ("it seems prudent to wait for instruction from the Second Circuit before fully discounting all confidential witness allegations—allegations which the Circuit has explicitly allowed the use of since at least its decision in Novak in 2000.").

[10] Defendants exaggerate the amount of time between CW1's departure from IntraLinks and the date on which the FDIC issued its RFP. Defendants incorrectly state that CW1 left IntraLinks "well over a year before the FDIC issued its request for bids." Defs' Br. at 19. Actually, CW1 left IntraLinks in September 2009, approximately ten months before the FDIC issued its RFP in July 2010. ¶¶ 71, 106. And, as discussed, the discussions and

These facts distinguish Defendants' cited authority.  For example, the complaint in *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323 (S.D.N.Y. 2011) sought to plead scienter in part by describing a meeting in which Macy's CEO told Liz Claiborne's ("LIZ") CEO he was furious over a deal between LIZ and a competitor.  *Id*. at 340-41.  The court held that the fact that Macy's CEO "was upset in November does not mean that the Macy's-LIZ relationship was rocky the following February."  *Id*. at 341.  But, here, the Complaint does not merely allege that the FDIC was "upset" at the time of CW1's observations.  Rather, it alleges that the FDIC made the decision not to renew its contract with IntraLinks and that it communicated that decision to IntraLinks.  ¶ 105.  The FDIC's subsequent behavior is entirely consistent with that fact – from issuing an RFP seeking a new provider to stopping its execution of new task orders (discussed below).  In other words, unlike *Taylor*, this case alleges a final decision that was made by the customer and communicated to the defendants.[11]

Finally, even putting aside the allegations that the FDIC directly informed IntraLinks of its decision to find another vendor, Defendants concede the FDIC issued an RFP in 2010.  Defs' Br. at 18.  That alone should have put the Exchange Act Defendants on notice that the FDIC might select another vendor (since that is the purpose of an RFP).  But the Exchange Act Defendants never disclosed the RFP.

**b      The FDIC Stopped Executing New Task Orders after September 2010**

---

unsuccessful attempt by the FDIC to renegotiate terms with IntraLinks, which led to the RFP, began long before July 2010.

[11] *Glaser*, is also inapposite.  There, the plaintiffs argued that a defendant's statement was contradicted by his later, truthful statement and that the contradiction supported a strong inference of scienter.  772 F. Supp. 2d at 597.  Plaintiff here makes no such argument.  Likewise, the plaintiffs' argument in *City of Roseville Employees' Retirement System v. Nokia Corporation*, No. 10-967, 2011 U.S. Dist. LEXIS 101264 (S.D.N.Y. Sept. 6, 2011) is not raised here.  There, the plaintiff argued that a July 2008 statement by the defendants that the company did not enter into an agreement with a major Chinese company showed the defendants knew the company could no longer compete in that market.  *Id*. at *31.  The court assumed the statement showed an inference of scienter for July 2008, but held that it did not reveal the defendants' scienter for statements made earlier, in April 2008.  *Id*. at *32.  In contrast, here, the allegations establish scienter throughout the Class Period, not merely at the end.

Scienter is also shown by the fact that the Task Orders that governed IntraLinks' work for the FDIC were winding down and/or expiring during the Class Period.  On November 18, 2010, Task Order 16 was modified by the FDIC and signed by Defendant Plesner to exercise "the final 6-month option period" and extend the final expiration date through June 9, 2011.  ¶ 107.  As Defendants note, the FDIC later extended the Task Order again, until March 31, 2012, consistent with the FDIC's decision to retain IntraLinks for existing projects "until they are resolved."  ¶ 150.  The second extension of Task Order 16 shows that the FDIC was winding down its business with IntraLinks during the Class Period.  It does not, as Defendants claim, suggest that IntraLinks did not lose the FDIC as a customer.

In fact, the FDIC executed its very last task order – Task Order 17 – on September 1, 2010.  *See* Declaration of Carol V. Gilden, Ex. E.  After that, the FDIC only extended existing task orders, but did not execute any new task orders.  The non-execution of new task orders after September 1, 2010 stands in stark contrast with past practice, when the parties executed new task orders every few months.  For example, the parties executed task orders in May and September 2009 (Task Orders 13 and 14) and in January, June, and September 2010 (Task Orders 15, 16, and 17).  *See* Gilden Decl., Exs. A-E.  The cessation of new task orders after September 1, 2010 further supports a strong inference that the Exchange Act Defendants knew the FDIC had decided to end its relationship with IntraLinks for all future business.   The inference is particularly strong for Defendant Plesner, who signed each and every task order and task order extension and therefore knew the precise status of the contractual arrangements with the FDIC.

        **c**       **Because the Facts Alleged Relate to IntraLinks' Core Business, they Support a Strong Inference of Scienter**

"When a plaintiff has adequately alleged that the defendant made false or misleading statements, the fact that those statements concerned the core operations of the company supports

the inference" of scienter.  *Atlas Air*, 324 F. Supp. 2d at 489-92; *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989); *City of Sterling Heights Police and Fire Ret. Sys. v. Abbey National, PLC*, 423 F. Supp. 2d 348, 361-62 (S.D.N.Y. 2006); *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, No. 11-5026, 2012 U.S. Dist. LEXIS 97185, at *33 (S.D.N.Y. July 13, 2012).

Here, there can be no dispute that the FDIC contract was at the core of IntraLinks' business.  The FDIC was IntraLinks' largest customer, was responsible for 23.5% and 15.7% of IntraLinks' Enterprise revenue in 2009 and 2010, respectively, and was discussed at investor conference calls.  ¶¶ 13, 110, 143.  The Exchange Act Defendants clearly knew the status of IntraLinks' relationship with the FDIC.  *See Berson*, 527 F.3d at 988-89 (holding it was "absurd to suggest" that defendants did not know their largest customers had issued stop-work orders); *Backe*, 642 F. Supp. 2d at 1186 (importance of departing customer to business supported strong inference of scienter).

### d       Motive and Opportunity Allegations Further Support a Strong Inference of Scienter

Although allegations that a defendant had the motive and opportunity[12] to benefit from a fraud are not necessary to plead scienter, the Complaint alleges that Defendants Damico and Plesner, as well as other Company insiders, engaged in massive insider trading during the Class Period, which supports a strong inference of scienter by itself or in combination with the other scienter allegations.  *See Tellabs*, 551 U.S. at 325 ("Personal financial gain may weigh heavily in favor of a scienter inference."); *Rothman v. Gregor*, 220 F.3d 81, 93-94 (2d Cir. 2000) (alleged motive may serve to establish scienter independently or to contribute to other scienter allegations); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 170 (2d Cir. 2000).  "[T]he 'motive'

---

[12] Defendants do not challenge the opportunity allegations.  Opportunity is met here because "[a]s senior executives, the Individual Defendants had the ability to direct the allegedly false and misleading statements to be made."  *In re Dynex Capital, Inc.*, No. 05-1897, 2009 U.S. Dist. LEXIS 96527, at *38 (S.D.N.Y. Oct. 19, 2009).

showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." *ECA*, 553 F.3d at 198.

The Complaint alleges that Damico, Plesner, and others personally profited from the artificial inflation of IntraLinks stock by selling over $77 million of stock during the Class Period. ¶¶ 214-16. Damico sold 145,875 shares for proceeds of over $4 million and Plesner sold 218,125 shares to earn over $6 million.  ¶ 214.  ***These figures correspond to over 19% of Damico's holdings and over 53% of Plesner's holdings, respectively***.[13]  The magnitude of these sales is well above what courts have held sufficient to demonstrate scienter, whether the sales are measured by their percentage of holdings[14] or by the cash proceeds.[15]

The stock sales were also unusual because were made in March and April 2011 – the same time that these Defendants were touting IntraLinks' supposed strong financial performance and reassuring investors of the Company's bright future.  *See In re Spyglass, Inc. Sec. Litig.*, No. 99-512, 1999 U.S. Dist. LEXIS 11382, at *19-20 (N.D. Ill. July 20, 1999) (stock sales were unusual "where defendants are publicly indicating that prospects for the company are improving. If Damico and Plesner sincerely believed such statements, they would be motivated to hold the

---

[13] *See* Declaration of Mark Holland in Support of the Motion by Defendants IntraLinks Holdings, Inc., the Officer Defendants and the Director Defendants to Dismiss Lead Plaintiff's Consolidated Class Action Complaint, Ex. E at 1 (Damico started with 751,093 shares); Ex. F at 1 (Plesner started with 410,524 shares).

[14] *See, e.g., Batwin v. Occam Networks, Inc.*, No. 07-2750, 2008 U.S. Dist. LEXIS 52365, at *42-45 (C.D. Cal. July 1, 2008) (sale of 18% of defendants' collective holdings held sufficient to show scienter, including for one defendant who sold only 7% of his holdings for $34,541); *Ross v. Abercrombie & Fitch Co.*, 501 F. Supp. 2d 1102, 1117 & n.5 (S.D. Oh. 2007) (inference drawn from insider sales was "at least as compelling" than the one from the fact that defendants retained between 73% and 74% of their holdings); *In re SeeBeyond Techs. Corp. Sec. Litig*, 266 F. Supp. 2d 1150, 1169 (C.D. Cal. 2003) (7.6% held sufficient); *Friedberg v. Discreet Logic*, 959 F. Supp. 42, 51-52 (D. Mass. 1997) (collective 12% held sufficient); *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (17% and 11% held sufficient); *Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1313 (C.D. Cal. 1996) (20% of holdings sold for $6.3 million held sufficient).

[15] *See, e.g., In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 278 (3d Cir. 2006) (sales of $2.3 million by one defendant and $627,832 were substantial and supported a strong inference of scienter); *In re Qwest Communs. Int'l, Inc. Sec. Litig.*, 396 F. Supp. 2d 1178, 1196 (D. Colo. 2004) ("$ 410,000 is a substantial sum, and reasonably can be seen as a significant gain from the alleged deception."); *Oxford*, 187 F.R.D. at 140 (amounts as low as $621,000 were "large" amounts supporting scienter).  The $77 million in stock sold collectively by insiders is also well above what is considered suspicious.  *See Oxford*, 187 F.R.D. at 140 ($ 78 million in collective sales is "massive by any measure"); *see also In re Daou Sys., Inc. Sec. Litig.*, 397 F.3d 704, 720 (9th Cir. 2005) (sales by non-defendant executives contributed to strong inference of scienter).

stock, not sell it."). Moreover, the sales occurred shortly before the disclosure that "a single Enterprise customer" was significantly decreasing its IntraLinks usage which caused IntraLinks stock to drop in price by approximately 33%. ¶¶ 214, 220. By unloading their shares when they did, Damico and Plesner avoided millions of dollars in losses. Such "[t]rades made a short time before a negative public announcement are suspiciously timed." *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999) (two months held suspicious); *Suprema Specialties*, 438 F.3d at 278 (six weeks held suspicious). Even analysts covering IntraLinks found the stock sales to be large in magnitude and suspicious, noting that "the substantial insider sales in April are bound to raise red flags among investors." ¶ 216; *see Helwig v. Vencor, Inc.*, 251 F.3d 540, 558 (6th Cir. 2001) (finding strong inference of scienter where stock sales were "substantial enough to attract the attention of the financial media").

Despite these well-pled allegations, Defendants claim that these sales were not suspicious because some, but not all, were made pursuant to Rule 10b5-1 trading plans. Defs' Br. at 13. However, "the existence of a Rule 10b5-1 Trading Plan is an affirmative defense that must be pled and proved." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 200-01 (S.D.N.Y. 2010); *see also Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 156 (D. Conn. 2007) ("Because it is questionable whether the trading plans should be considered and because issues of fact remain with regard to the trading plans, the Court will not consider them.").[16] Moreover, in order for a 10b5-1 trading plan to rebut an inference of scienter, it must be entered into "[b]efore becoming

---

[16] *See also In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 722 (W.D. Tex. 2010) ("[W]hether or not the stocks in this case were sold pursuant to a 10b5-1 trading plan is irrelevant at this stage in the proceedings, as the existence of such a plan is an affirmative defense, which requires evidence of the plan itself and of details such as the date the plan was entered into and whether it wholly removed trades from the defendant's discretion."); *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1193 (D. Nev. 2009) ("[A] 10b5-1 trading plan does not provide an absolute defense to a claim of insider trading. Rather, it requires an additional factual finding of good faith. Not only can this Court not make such factual findings when considering a motion to dismiss, but this Court must also draw all inferences in favor of the non-moving party."); *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 n.16 (N.D. Cal. 2009); *In re Able Labs. Sec. Litig.*, No. 05-2681, 2008 U.S. Dist. LEXIS 23538, at *102, n.40 (D.N.J. Mar. 24, 2008); *In re Infosonics Corp. Derivative Litig.*, No. 06-136, 2007 U.S. Dist. LEXIS 66043, at *24-25 (S.D. Cal. Sept. 4, 2007); *In re Cardinal Health, Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 734 (S.D. Ohio 2006).

aware of the [material nonpublic] information[.]"  17 C.F.R. § 240.10b5-1; *see also George v. China Auto. Sys.*, No. 11-7533, 2012 U.S. Dist. LEXIS 111730, at *25 (S.D.N.Y. Aug. 8, 2012); *Freudenberg*, 712 F. Supp. 2d at 201.  Defendants' 10b5-1 plans are not before the Court – nor is the date of their adoption – and this is not the proper stage to evaluate their significance.

Additionally, Defendants concede that both Damico and Plesner violated their trading plans by selling stock outside of their plans.  Defs' Br. at 14.  On April 12, 2011, Damico sold over $1.8 million in stock (by far the most he sold on any single day) and Plesner sold almost $1.1 million in stock outside of their plans.  ¶ 215.  These sales account for approximately 49% and 20% of the shares sold by Damico and Plesner, respectively, during the Class Period. Defendants provide no explanation for their non-plan-compliant sales, nor could they.  The very purpose of a 10b5-1 trading plan is to allow corporate insiders to passively sell their stock based on pre-determined triggers, without direct involvement.  Selling outside of the plan obviously defeats this purpose and raises serious questions about why these Defendants would violate their plans in order to sell stock.[17]  The sales also call into question whether these Defendants entered into their trading plans in good faith and therefore provide yet another reason why those plans should not immunize Defendants here.  *See CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 654 F.3d 276, 302 n.13 (2d Cir. 2011) (Winter, J., concurring) ("the affirmative defense [under § 10b5-1] is available only when the plan to purchase or sell securities was 'given or entered into in good faith and not as part of a plan or scheme to evade prohibitions of this section'").

Finally, Defendants argue that Plaintiff must plead the "net profits" recovered by Damico and Plesner on the stock sales instead of the gross proceeds.  Defs' Br. at 14.  Not only are net profits not disclosed and therefore impossible to allege, but there is no logical reason why net

---

[17] There is no relevance to Defendants' observation that the "sales were fully disclosed in the Prospectus."  Defs' Br. at 14.  Stock sales by corporate insiders are always disclosed.  *See* 15 U.S.C. § 78p(a).

22

profits would be more probative than gross proceeds.  The relevance of the stock sales is that they show that Damico and Plesner expected the price of the stock to decline – otherwise they would have held the stock.  The amount of profit made on the sales is simply irrelevant because it does not change the significance of the sales.  Not surprisingly, courts overwhelmingly consider gross proceeds in deciding whether stock sales are suspicious, as this Court has done. *See In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 468 (S.D.N.Y. 2008) (Griesa, J.).[18]

### e        Resignations Support a Strong Inference of Scienter

Executive resignations also add to the strong inference of scienter.  *See In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007).[19]  Even resignations "not accompanied by an extraordinary punishment" can be "highly probative of scienter." *Middlesex Ret. Sys. v. Quest Software, Inc.*, No. 06-6863, 2008 U.S. Dist. LEXIS 68419, at *24 (C.D. Cal. July 10, 2008).  Here, Defendant Damico, IntraLinks' CEO, resigned on December 15, 2011, approximately one month after the revelation that IntraLinks had lost the FDIC account and the disclosures about the problems with IntraLinks' Enterprise revenue.  ¶ 164.  Then, on May 9, 2012, it was announced that Defendant Plesner, IntraLinks' CFO, was also leaving the Company. *Id*.  "Such house-cleaning and reforms do not follow innocent mistakes." *In re Am. Serv. Grp., Inc.*, No. 06-0323, 2009 U.S. Dist. LEXIS 28237, at *159 (M.D. Tenn. Mar. 31, 2009).[20]

### f        SEC Investigation Supports a Strong Inference of Scienter

A pending government investigation into the company contributes to a strong inference

---

[18] *See also Daou*, 397 F.3d at 709, 720 (considering proceeds); *No. 84 Emp'r-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 939 (9th Cir. 2002) (same); *In Re Cabletron Sys.*, 311 F.3d 11, 27, 40 (1st Cir. 2002) (same); *Batwin*, 2008 U.S. Dist. LEXIS 52365, at *43 (same); *Marksman*, 927 F. Supp. at 1313 (same).

[19] *See also Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 608 (S.D.N.Y. 2009); *In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 534 (S.D.N.Y. 2009); *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008)

[20] Defendants cite *Glaser*, 772 F. Supp. 2d at 598, which held that resignations must be "highly unusual and suspicious" to create a strong inference of scienter.  However, *Glaser* recognized that resignations shortly after the revelation of the fraud are highly unusual and suspicious and therefore supports Plaintiff's position here. *See id*. (citing *Sadia*, 643 F. Supp. 2d at 523-24, 534).

of scienter.  *See Oxford*, 51 F. Supp. 2d at 295 (investigation by NYAG contributed to a strong inference of scienter); *In re Syncor Int'l Corp. Sec. Litig.*, 327 F. Supp. 2d 1149, 1162 (C.D. Cal. 2004), *aff'd in part and rev'd in part on other grounds*, 239 F. App'x 318 (9th Cir. 2007) (SEC investigation was appropriately considered in evaluating scienter).   Here, on August 10, 2011, just months after IntraLinks' revealed that a "single Enterprise customer" was decreasing its usage of IntraLinks' services, IntraLinks announced that the Company had received a subpoena from the SEC.  ¶ 153.  The understanding in the investment community is that the SEC investigation relates to IntraLinks' revenue recognition practices and statements made in the Company's 2010 Form 10-K and Secondary Offering materials.  ¶¶ 155-58.

> **g      Considered Collectively, the Complaint's Scienter Allegations Create a Strong Inference of Scienter as to the FDIC's Impending Departure**

As *Tellabs* instructs, the proper scienter inquiry "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs*, 551 U.S. at 322-23.[21]  Thus it is a holistic inquiry that the Court must conduct of the scienter allegations discussed above; considered collectively, these allegations give rise to a strong inference of scienter as to the loss of the FDIC account that is "at least as strong as any opposing inference[.]"  *Tellabs*, 551 U.S. at 326. Indeed, the only competing inference offered by Defendants is that "IntraLinks reasonably expected the FDIC to continue to be a customer of IntraLinks."  Defs' Br. at 18.  However, that inference is necessarily less compelling because it is inconsistent with the facts alleged in the Complaint.  In particular, it is inconsistent with the facts that the FDIC informed IntraLinks that

---

[21] *See also Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011) ("the only appropriate approach" in reviewing scienter allegations is to "address[] the allegations collectively, . . . quickly, and, importantly," without "pars[ing] out the allegations for individual analysis."); *Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 272-73 & n.46 (3d Cir. 2009) (courts should not "formulate categorical rules about the sufficiency of different types of allegations in the abstract" but must consider the scienter allegations holistically).

it would not be renewing its contract, that the FDIC instead issued an RFP, and that the FDIC stopped executing new task orders. The Supreme Court has instructed that the only competing inferences to be considered are those "rationally drawn from the facts alleged." *Tellabs*, 551 U.S. at 314. Because the competing inference offered by Defendants is inconsistent with the facts alleged, it should not be considered. Moreover, Defendants' inference is certainly no more compelling than the strong inference of scienter drawn from the Complaint.

### 3. The Complaint Creates a Strong Inference of Scienter as to the Misclassification of Revenue and Customer Overbilling

The Complaint demonstrates that the Exchange Act Defendants either knew or were reckless in not knowing that IntraLinks was mischaracterizing Enterprise revenue and was inflating its revenues by overbilling customers. As discussed above, Defendants' purported scienter arguments regarding the misclassification of revenue actually go to the issue of falsity. *See* Defs' Br. at 20-21; Section II.A.2 *supra*. Any challenge to scienter would fail as the Complaint pleads the required strong inference. The confidential witnesses describe a widespread policy of misclassifying revenue which was instituted by senior Company personnel. ¶¶ 90-96. And many of the scienter allegations discussed in the previous section – including the core business doctrine, motive and opportunity allegations, executive resignations, and SEC investigation – support a strong inference of scienter on this issue as well.

Also sufficient are the scienter allegations pertaining to IntraLinks' overbilling. The Complaint alleges that in the process of implementing a new software system, the accounting department discovered that IntraLinks was overbilling customers by as much as 20 to 30%. ¶ 118. This information was taken directly to IntraLinks' management, and the new accounting system was not implemented. *Id*. CW1 spoke to Frank Brunetti, the Senior Vice President of Product Marketing and the "right arm" of Defendants Damico and Plesner about the overbilling

issue.  ¶ 120.  CW1 also had conversations with Plesner himself, who "would get threatening if you tried to dig too hard" on the overbilling issue.  ¶ 121.  Defendants' argument that the billing system may have improved after CW1 left the Company is incompatible with the reasonable inference which must be drawn in Plaintiff's favor that these problems, which IntraLinks refused to correct while CW1 worked at IntraLinks, continued after CW1 left the Company, particularly given the corporate culture at the Company.  ¶¶ 85-86, 120-21; *see Iowa Pub. Emps' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 143 n.13 (2d Cir. 2010) (holding that the existence of a risk-management problem at a particular time "may support an inference that it was present six months earlier" and that district court failed "to draw a reasonable inference in the plaintiff's favor" when it declined to infer the existence of the problem at the earlier time).  Moreover, it is plausible that CW1, as the manager of the West Coast sales representatives, would have direct knowledge of customer issues, including billing complaints, and would be involved in addressing such issues.  ¶ 71.

### C.    The Complaint Adequately Pleads Loss Causation

Defendants do not challenge, and therefore concede, that the Complaint adequately pleads loss causation as to allegations regarding the departure of the FDIC.  Instead, Defendants argue only that the Complaint fails to plead loss causation as to the allegations regarding Defendants' improper classification of Enterprise revenue and overbilling of customers.  Defs' Br. at 22-25.  Defendants are wrong, as the Complaint alleges loss causation under both the "materialization of the risk" theory and the "corrective disclosure" theory.

"Allegations of loss causation are not subject to the heightened pleading requirements of Rule 9(b) and the PSLRA."  *Richman v. Goldman Sachs Group, Inc.*, No. 10-3461, 2012 U.S. Dist. LEXIS 86556, at *42 (S.D.N.Y. June 21, 2012).  "Rather, a short and plain statement—the standard of Rule 8(a)—is all that is necessary at this stage of the litigation."  *Id.*; *see also Dura*

*Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005) (the loss causation pleading standard is not "burdensome"; a plaintiff must simply "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind").

In the Second Circuit, "[l]oss causation may be adequately pleaded by alleging either a corrective disclosure of a previously undisclosed truth that causes a decline in the stock price or the materialization of a concealed risk that causes a stock price decline." *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, No. 10-7498, 2012 U.S. Dist. LEXIS 46202, at *53-54 (S.D.N.Y. Mar. 30, 2012). In other words, while loss causation "is typically shown by the reaction of the market to a 'corrective disclosure' which reveals a prior misleading statement . . . loss causation may also be shown by the 'materialization of risk' method, whereby a concealed risk . . . comes to light in a series of revealing events that negatively affect stock price over time." *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 555 (S.D.N.Y. 2011); *Nathel v. Siegal*, 592 F. Supp. 2d 452, 467 (S.D.N.Y. 2008) ("where some or all of the risk is concealed by the defendant's misrepresentation or omission, courts have found loss causation sufficiently pled"). Accordingly, Plaintiff need not, as Defendants contend, allege a corrective disclosure such as a financial restatement in order to plead loss causation. Curiously, Defendants brief altogether ignores the "materialization of risk" theory of loss causation.[22]

Here, the Complaint's loss causation allegations are straightforward and easily meet the Rule 8 notice pleading standard. The Complaint alleges that, during the Class Period, the Exchange Act Defendants touted the financial performance of IntraLinks' Enterprise segment while concealing the true state of affairs, including that much of the supposed growth of Enterprise was actually due to misclassification of revenue and overbilling of customers. These

---

[22] Moreover, because loss causation is a matter of proof at trial, "it is often inappropriate to use a Rule 12(b)(6) motion as a vehicle to resolve disputes over 'loss causation.'" *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 267 n.35 (5th Cir. 2009).

Defendants thereby portrayed the Enterprise segment as financially far more successful than it actually was and hid the risk that problems with IntraLinks' sales force could cause poor financial performance.  This concealed risk materialized and was disclosed to the market on November 8, 2011, when IntraLinks reported weak revenues and acknowledged problems with the Enterprise business, including issues with the "quality, composition and tenure" of the sales force.  ¶¶ 159-60, 223.  The revelation of the true state of the Enterprise segment caused a severe drop in IntraLinks' stock price, from $8.79 per share to $4.80 per share over the next two trading days, wiping out more than $209 million in market capitalization.  ¶ 223.  These allegations plainly supply "some indication" of the causal connection of Plaintiff's loss to the misrepresentations, in compliance with *Dura*.  544 U.S. at 346-47.

Numerous courts have held loss causation properly pled under "materialization of risk" theories similar to here.  For example, in *Lehman Brothers*, the court held that plaintiffs sufficiently pled loss causation where "the alleged misstatements and omissions concealed the extent of Lehman's exposure to asset classes" and "overstated Lehman's financial strength generally[.]"  799 F. Supp. 2d at 306-07.  That complaint adequately alleged that it was "the materialization of the risks thus concealed that ultimately killed Lehman."  *Id.*

The allegations here are analogous.  The Exchange Act Defendants' positive statements about the strength of IntraLinks' Enterprise segment and their failure to disclose the misclassification of revenue and overbilling concealed the true state of affairs and the risk of financial underperformance.  Stated differently, given these statements, IntraLinks' investors would not have expected the problems with the Enterprise segment that were eventually revealed.  *See Vivendi*, 765 F. Supp. 2d at 556 (denying defendants' motion for summary judgment on the issue of loss causation where there was evidence that "the zone of risk—a liquidity crisis—would have been thought unlikely by shareholders who believed Vivendi's

repeated assurances about its financial health"); *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 413 (S.D.N.Y. 2010) (loss causation properly pled where risk of losses from Bernard Madoff's misappropriation were concealed by the non-disclosure of the fact that the investment manager was not subject to any due diligence).

Plaintiff's loss causation theory is fully consistent with *Lentell v. Merrill Lynch & Co. Inc.*, 396 F.3d 161 (2d Cir. 2005) which holds that, where an alleged misstatement conceals a risk, a plaintiff may establish loss causation by pleading that it was "the materialization of the concealed risk" that caused the loss. *Id*. at 173; *see also Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 623 n.16 (S.D.N.Y. 2008) ("[U]nder the language of *Lentell*, '[t]here are several possible methods of pleading loss causation, including 'direct causation,' 'materialization of risk,' and 'corrective disclosure.'").[23]

Finally, even if a corrective disclosure were required, that would be met here, as the announcement of the SEC investigation and the disclosure of the problems with the Enterprise segment both qualify as such. *See, e.g.*, *In re Bradley Pharm., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828-29 (D.N.J. 2006) (where defendants had issued inflated sales figures, announcement of non-specific SEC inquiry was a corrective disclosure); *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 256 (D. Mass. 2006) (where defendants touted business but failed to disclose material information, revelation of non-specific SEC investigation was corrective disclosure).[24]

## III.   The Complaint Pleads Violations of Sections 11 and 12(a)(2) of the Securities Act

"Sections 11 and 12(a)(2) impose liability on certain participants in a registered securities

---

[23] Defendants also rely on *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666 (S.D.N.Y. 2007), but, like *Lentell*, that case recognized that "[l]oss causation may also be pleaded by allegations that a defendant's misstatements or omissions concealed a risk that later materialized to cause the plaintiff's loss." *Id*. at 677.  The complaint in *AOL* did not properly allege a materialization of risk because the complaint did not provide any "indication of the nature of the risk alleged[.]"  *Id*. at 678.

[24] Because the Complaint properly pleads a claim for primary violation of Section 10(b) and Rule 10b-5, the Section 20(a) claim against Defendants Damico and Plesner is also cognizable.  ¶¶ 243-48.

offering when the registration statement or prospectus associated with that offering contains material misstatements or omissions." *Goldman Sachs*, 2012 U.S. App. LEXIS 18814, at \*26. "Section 11 imposes strict liability on issuers and signatories, and negligence liability on underwriters, '[i]n case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" *Panther Partners Inc. v. Ikanos Commc'n's, Inc.*, 681 F.3d 114, 119-20 (2d Cir. 2012) (quoting 15 U.S.C. § 77k(a)). "Section 12(a)(2) imposes liability under similar circumstances for misstatements or omissions in a prospectus." *Id.* (citing 15 U.S.C. § 77l(a)(2)). "Neither scienter, reliance, nor loss causation is an element of § 11 or § 12(a)(2) claims[.]" *Id.* "Thus, the provisions 'place[] a relatively minimal burden on a plaintiff.'" *Id.*

### A.    The Securities Act Claims are Subject to Rule 8

Claims brought under Sections 11 and 12(a)(2) are governed by the pleading standard in Rule 8(a). *In re Worldcom, Inc. Sec. Ltig.*, No. 02-3288, 2004 U.S. Dist. LEXIS 11696, at \*7 (S.D.N.Y. June 29, 2004). Rule 8(a) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 283 (S.D.N.Y. 2009). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *see also Arista Records, LLC v. Doe 3*, 604 F.3d 110, 119 (2d Cir. 2010) (*Twombly* and *Iqbal* do not require the pleading of specific evidence or extra facts beyond what is necessary to make a claim plausible).

Defendants argue that these claims "sound in fraud" and must therefore meet the Rule 9(b) pleading standard.  However, each of Defendants' arguments for why these claims supposedly "sound in fraud" has been rejected over and over again by courts within this District. First, Defendants argue that the allegations supporting the Section 11 and 12(a)(2) claims are

"inextricably interwined [sic]" with the allegations supporting the Section 10(b) claim.  Defs' Br. at 27.  This is apparently because the Section 11 and 12(a)(2) claims do not allege any false or misleading statement "that is independent of the" conduct giving rise to the Section 10(b) claim. *Id*. at 28.  But the fact that the Defendants' conduct separately gives rise to a fraud claim does not mean that Plaintiff's Securities Act claims must sound in fraud.  *See In re IAC/Interactivecorp Sec. Litig.*, 695 F. Supp. 2d 109, 116-17 (S.D.N.Y. 2010) (fact that "the allegations supporting plaintiffs' Section 11 claim are the same as those supporting their Section 10(b) claim" did not mean the Section 11 claim sounded in fraud); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632-33 (S.D.N.Y. 2007) (even though defendants "were engaged in a massive fraud" that fact "does not take away plaintiffs' right to plead in the alternative that defendants violated provisions requiring only negligence").

Second, Defendants point to certain allegations that they contend show that the Securities Act claims sound in fraud.  *See* Defs' Br. at 28.  Most of these allegations simply track the language of Sections 11 and 12(a)(2) as they allege that the Registration Statement and Prospectus were "false and misleading" because they "omitted" certain information.  Time and again, courts have held that these sorts of allegations do not mean the claims sound in fraud, because these allegations exist in every complaint pleading Securities Act claims.  *See, e.g.*, *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 375 (S.D.N.Y. 2011) (rejecting argument "that phrases such as 'materially false or misleading' and 'untrue statements of material fact' sound in fraud" because the complaint "merely tracks the language of Section 11").[25]  Defendants also point to an allegation that the failure to disclose the FDIC's departure was "an omission of a

---

[25] *See also In re CitiGroup, Inc. Bond Litig.*, 723 F. Supp. 2d 568, 586, 571 (S.D.N.Y. 2010) ( "mere use of the statutory language is itself insufficient to render a complaint one that 'sounds in fraud'");  *In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 757 F. Supp. 2d 260, 321 (S.D.N.Y. 2010) ("While the defendants argue that the Securities Complaint's characterization of the Joint Proxy as 'false and misleading' assert claims that sound in fraud, the text of Rule 14a-9 itself prohibits the speaker from uttering 'false or misleading' statements 'with respect to any material fact . . . .'").

material uncertainty *known to management*." Defs' Br. at 28. However, the fact that a complaint alleges that "a fact was known and not disclosed does not mean, as a matter of law, that the circumstances of the resulting omission sound in fraud." *Citiline Holdings, Inc. v. iStar Fin'l, Inc.*, 701 F. Supp. 2d 506, 513 (S.D.N.Y. 2010); *Charter Twp. of Clinton Police & Fire Ret. Sys. v. KKR Fin. Holdings LLC*, No. 08-7062, 2010 U.S. Dist. LEXIS 122127, at *41 (S.D.N.Y. Nov. 17, 2010) ("Plaintiff's allegation that Defendants were 'aware' of the risks involved in KFN's mode of financing is miles away from alleging fraudulent conduct.").

The allegations supporting the Securities Act claims here make it unmistakable that they allege negligent – not fraudulent – conduct. The Complaint repeatedly alleges that the Securities Act Defendants acted "negligently" in failing to disclose material information, ¶¶ 253, 281, 285, and that those Defendants failed to conduct "an adequate investigation" and failed to exercise "reasonable care[,]" ¶¶ 300, 301, 311; *see Refco*, 503 F. Supp. 2d at 632 (Securities Act claims did not sound in fraud where they were "carefully couched in the language of negligence"). Moreover, Plaintiff has taken great care to separate the Securities Act allegations from the fraud allegations in order to avoid any confusion as to whether the Securities Act claims sound in fraud. *See* ¶¶ 249-319; *see Refco*, 503 F. Supp. 2d at 632 ("This careful division [of fraud and non-fraud claims] makes it easy to distinguish between the two"); *IAC*, 695 F. Supp. 2d at 116-17 (drafting a "two-part complaint[], each portion sufficient to stand alone for its respective pleading purposes, though essentially duplicating and overlapping large components of the other" sufficient to avoid finding that Section 11 claim sounds in fraud).[26]

Finally, even Defendants' own authority supports the conclusion that the Securities Act

---

[26] Furthermore, Plaintiff has expressly disclaimed any claim of fraud arising out of the Securities Act claims. ¶¶ 249, 294, 307. *See In re Bank of Am. Corp. Sec. Litig.*, 757 F. Supp. 2d 260, 321-22 (S.D.N.Y. 2010) (where plaintiffs disavowed fraud, claim could not be construed to sound in fraud); *WorldCom*, 2004 U.S. Dist. LEXIS 11696, at *7 n.4 (same).

claims against the Underwriter Defendants do not sound in fraud.  *See In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 597 (S.D.N.Y. 2006) (allegations against underwriters sounded only in negligence, not fraud).

### B.     Rule 9(b) Does Not Add a Scienter Requirement to the Securities Act

Even if, hypothetically, Defendants were correct that the Securities Act claims sound in fraud (which Defendants are not) and are as such subject to Rule 9(b), the only consequence would be that the Complaint would have to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004).  The Complaint clearly meets this standard, *see* ¶¶ 286-93, and Defendants do not argue otherwise.  Instead, they argue that the application of Rule 9(b) creates a scienter requirement for the Securities Act claims.  Defendants are clearly wrong on this point.

It is well-settled that Sections 11 and 12(a)(2) do not contain the element of scienter.[27] And if a Section 11 or 12(a)(2) claim sounds in fraud and becomes subject to Rule 9(b), that does not, and could not, act as a statutory amendment to add a new element to the claim.  This is because Rule 9(b) is procedural, not substantive; it defines the level of specificity required to be pled, but does not amend the elements in a federal statute.  Therefore, when a Section 11 claim sounds in fraud and is subject to Rule 9(b), "[o]f course, the scienter requirement of Rule 9(b) does not apply to Section 11 claims[.]"  *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 & n.3 (9th Cir. 1996).  Indeed, Judge Rakoff discussed this precise issue, stating at a hearing that when the Second Circuit says "you have to plead fraud with particularity, it doesn't mean you have to plead with particularity an element that is not an element of the complaint. It just means, for

---

[27] *Panther*, 681 F.3d at 20 ("Neither scienter, reliance, nor loss causation is an element of § 11 or § 12(a)(2) claims[.]"); *Rombach*, 355 F.3d at 169 n.4; *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 202-05 (E.D.N.Y. 2000) ("the defendant's knowledge of the misrepresentations is not an element of a [Securities Act] claim; indeed, a defendant can be held liable even for an innocent misstatement").

example, the misrepresentations would have to be spelled out in 9(b) detail as opposed to the more general detail that rule 8 would require." *La. Mun. Police Emps.' Ret. Sys. v. Merrill Lynch & Co., Inc.*, No. 08-9063 (S.D.N.Y. Feb. 19, 2009), Tr. at 63:19-64:5, Ex. F to the Gilden Decl. Numerous other authorities are in accord.[28]

Defendants' authorities are unpersuasive as none contains any analysis of this issue. *See* Defs' Br. at 29. Instead, in each case the court appears to have confused the requirements of the Securities Act claims with the requirements of Section 10(b). For example, in *In re JPMorgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005), the court dismissed a Section 11 claim for failure to meet the PSLRA's requirement of a strong inference of scienter, yet there is no question that the requirements of the PSLRA do not apply to Securities Act claims. *See Panther*, 681 F.3d at 120; *In re IPO Sec. Litig.*, 241 F. Supp. 2d 281, 338 (S.D.N.Y. 2003) ("[T]he PSLRA pleading requirements have no application to claims that arise under §11 or other provisions of the Securities Act").

## C.    Knowledge is Not Required by Sections 11 or 12(a)(2)

As discussed above, knowledge is not an element under either Section 11 or 12(a)(2). Instead, as the Supreme Court has held, under Section 11, "[i]f a plaintiff purchased a security issued pursuant to a registration statement, he need show only a material misstatement or omission to establish his prima facie case." *Herman & MacLean v. Huddlesteon*, 459 U.S. 375, 382 (1983). "Liability against the issuer of a security is virtually absolute, even for innocent misstatements." *Id.* Therefore, Plaintiff need not allege Defendants' knowledge of the FDIC's impending departure, of revenue misclassification, or of overbilling in order to state claims under

---

[28] *See, e.g.*, *Scottish*, 524 F. Supp. 2d at 393, 398, 399 n.213 (although Section 11 claims "sounded in fraud," court applied scienter analysis only to Section 10(b) claims); *In re BellSouth Corp. Sec. Litig.*, 355 F. Supp. 2d 1350, 1362 n.9, 1365 n.11 (N.D. Ga. 2005) (applying Rule 9(b) to Section 11 claims, but stating that "[u]nder [§11], if … the statements are determined to be material, the claim survives [dismissal]," and that only Exchange Act claims are evaluated for pleading scienter).

Section 11 and 12(a)(2).

*GT Solar* is directly on-point.  There, the court held that the defendant's registration statement contained misleading statements where it failed to disclose the substantial likelihood that the company's largest customer would soon move its business to a competitor.  Although the defendants argued strenuously that the complaint did not adequately allege that they knew the customer would leave, the court found that focus "curious, to say the least, because [n]either knowledge nor reason to know is an element in a plaintiff's prima facie case under §§ 11 or 12(a)(2) of the Securities Act."  2009 U.S. Dist. LEXIS 93820, at *19 (internal quotation marks omitted).  The court held that "the defendants' point about what the plaintiff has not alleged they knew is irrelevant" because "[a]t most, it invokes the statutory defense of due diligence (or reasonable investigation) on the part of the individual defendants" which was not an issue to be decided on the motion to dismiss.  *Id.* at *20.

Similarly, here, it is not necessary to allege that Defendants knew that IntraLinks had lost the FDIC as a customer in order to plead claims under the Securities Act (although knowledge is properly pled for the reasons discussed in the following section).  Plaintiff must simply allege enough facts to make it plausible that there was a substantial likelihood at the time of the Secondary Offering that the FDIC would leave.  *See Twombly*, 550 U.S. at 570 (courts should not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face").  The Complaint easily meets this standard, as it alleges that the FDIC informed IntraLinks that it would not be renewing its contract and would instead seek new bids, ¶ 105; that the FDIC distributed an RFP to VDR providers, ¶¶ 17, 106; and the FDIC stopped executing new task orders with IntraLinks after September 1, 2010, s*ee supra* Section II.B.2.b.  Indeed, the FDIC's issuance of the RFP – a fact that Defendants concede, Defs' Br. at 31 – alone makes it plausible that there was a substantial likelihood that the FDIC would choose

another vendor since the very purpose of an RFP is to consider other vendors.

### D.     Defendants Violated Item 303(a) of SEC Regulation S-K

The Complaint identifies several statements contained within the Registration Statement that were materially false and misleading for failing to disclose the impending departure of the FDIC.   ¶¶ 287-93.   The existence of these false and misleading statements and omissions is sufficient to create liability under the Securities Act.   However, Plaintiff has also pled, in the alternative, that Defendants violated Item 303(a) of SEC Regulation S-K as a separate and independent basis for liability.   Item 303(a) requires the disclosure in registration statements of "uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."   17 C.F.R. § 229.303(a) instruction 3.   The SEC has stated that "the likely non-renewal of a material contract" is an item required to be disclosed.   *See* Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures, SEC Release No. 6835, 1989 SEC LEXIS 1011, at *12 (May 18, 1989).

The knowledge that must be alleged to plead a violation of Item 303(a) is knowledge of the "uncertainty."   *See Panther*, 681 F.3d at 120.   Here, the Complaint easily meets the Rule 8 standard[29] of alleging that Defendants knew – at the very least – that whether the FDIC would renew its contract with IntraLinks was uncertain and this uncertainty was reasonably likely to materially impact IntraLinks' financial condition.   Indeed, the Complaint actually alleges far more – that Defendants already knew the FDIC would not renew its contract.   *See supra* Section II.B.2.   And the Complaint alleges Defendants' knowledge existed prior to the Secondary Offering.   *Id*.   At the very least, Defendants knew that the FDIC had issued an RFP and was

---

[29] The Second Circuit has twice confirmed in the context of Section 11 claims alleging violations of Item 303 that such claims, despite their "knowledge" element, need only be pled under Rule 8(a).  *See Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715-21 (2d Cir. 2011); *Hutchison v. Deutsche Bank Sec., Inc.*, 647 F.3d 479, 486 (2d Cir. 2011).

considering other vendors and could have very easily, but did not, disclose that fact.[30]

### E.    The Registration Statement and Prospectus Contained False and Misleading Statements and Omissions

Defendants add a short throwaway argument challenging the falsity of some, but not all, of the statements in the Secondary Offering documents. Defs' Br. at 33. As explained above in Section II.A.2, multiple courts have held statements almost identical to Defendants' representations that the Enterprise market was IntraLinks' "largest and fastest growing market" to be false and misleading where defendants failed to disclose the loss of a significant customer, or even just failed to disclose that such a loss was likely to occur. Likewise, Defendants' argument that one of the many false statements in the Registration Statement and Prospectus is inactionable puffery is incorrect for the reasons discussed in Section II.A.2.

## IV.    Each of the Defendants is Liable Under Section 12(a)(2)

The Officer and Director Defendants (each of whom signed the Registration Statement) argue that they are not statutory sellers under Section 12(a)(2).[31] In this Circuit, a person is a "statutory seller" if he "successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve his own financial interest or those of the securities['] owner." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010) (alterations in original).

---

[30] Defendants wrongly contend that they are protected from liability because of certain vague disclosures in the Prospectus. Defs' Br. at 31-32. The bespeaks caution doctrine is only applicable where the cautionary language "'warn[s] investors of exactly the risk that plaintiffs claim was not disclosed.'" *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 230 (S.D.N.Y. 1999). This doctrine will not insulate an issuer from liability where, as here, the risk allegedly disclosed has already come to fruition. *See Rombach*, 355 F.3d at 173 ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."). Moreover, it "is settled that the bespeaks-caution doctrine applies only to statements that are forward-looking." *MF Global*, 620 F.3d at 142. Here, Defendants false and misleading statements in the Registration Statements were statements of present or historical fact. *See, e.g.*, ¶ 287 ("Today, this enterprise market is our largest and fastest growing market[.]"); ¶ 289 ("We believe our customers have a high level of satisfaction[.]"). Finally, IntraLinks' risk disclosures were far too vague and general to invoke the bespeaks caution doctrine. *See In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 211-12 (S.D.N.Y. 2004) (holding cautionary language about potential non-renewal of advertising contracts insufficient where omissions were specific and factual because "if a party is aware of a particular problem worthy of disclosure, the party may not rely on general disclaimers to avoid liability"); *Panther*, 681 F.3d at 122 (generic cautionary language about product defects did not inform investors "of the particular, factually-based uncertainties of which [the defendant] was aware").

[31] Neither IntraLinks nor the Underwriter Defendants argue that they are not statutory sellers under Section 12(a)(2).

With only rare exceptions, courts in this District hold that "on a motion to dismiss, officers or directors of the stock issuer who signed the registration statement are deemed to have solicited the purchase of the offered stock." *Briarwood Invs. Inc. v. Care Inv. Trust Inc.*, No. 07-8159, 2009 U.S. Dist. LEXIS 18963, at *13 (S.D.N.Y. March 4, 2009) (Stanton, J.).[32]  Defendants cite only one contrary holding from within this Circuit and rely chiefly on out-of-circuit authority.[33]

The Second Circuit has explained that the "objective of a prospectus is to solicit investment by the general public." *Greenapple v. Detroit Edison Co.*, 618 F.2d 198, 210 (2d Cir. 1980).  It is therefore likely that the Second Circuit would hold that those who sign a Registration Statement effectively solicit the purchase of securities. *See APAC Teleservice*, 1999 U.S. Dist. LEXIS 17908, at *32 ("[B]ecause the prospectus itself is a document that solicits the purchase of securities, those who sign the registration statement should be deemed persons who solicited the purchase of the offered securities.").

## CONCLUSION

For the reasons stated herein, Defendants' motions to dismiss should be denied. However, if the Court grants Defendants' motions, Plaintiff respectfully requests leave to amend the Complaint, which is "the usual practice upon granting a motion to dismiss[.]" *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 298 (S.D.N.Y. 2006).

---

[32] *See also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 454 (S.D.N.Y. 2005) (Conner, J.) ("An officer or director who signs a Registration Statement containing materially false or misleading statements or omissions is deemed, for pleading purposes, to have solicited a purchase[.]"); *In re Deutsche Telekom AG Sec. Litig.*, No. 00-9475, 2002 U.S. Dist. LEXIS 2627, at *14 (S.D.N.Y. Feb. 20, 2002) (Stein, J.) ("while the nature of a prospectus itself is to solicit the purchase of securities, it is those who sign the registration statement that accompanies the prospectus who are deemed solicitors"); *Steed Fin. LDC v. Nomura Sec. Int'l Inc.*, No. 00-8058, 2001 U.S. Dist. LEXIS 14761, at *23 (S.D.N.Y. Sept. 20, 2001) (Buchwald, J.) ("A person who signs a registration statement is deemed to have solicited the purchase of the offered securities"); *In re APAC Teleservices, Inc. Sec. Litig.*, No. 97-9145, 1999 U.S. Dist. LEXIS 17908, at *33 (S.D.N.Y. Nov. 19, 1999) (Jones, J.).

[33] Contrary to Defendants' suggestion, there is no consensus on this question outside the Second Circuit, and many courts outside this Circuit have held that one who signs a registration statement is a statutory seller under Section 12(a)(2).  *See, e.g., In re Nat'l Golf Props., Inc. Sec. Litig.*, No. 02-1383, 2003 U.S. Dist. LEXIS 4321, at *9 (C.D. Cal. Mar. 19, 2003); *Schaffer v. Evolving Sys., Inc.*, 29 F. Supp. 2d 1213, 1223 (D. Colo. 1998); *Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F. Supp. 1101, 1133 (W.D. Mich. 1996); *In re Proxima Corp. Sec. Litig.*, No. 93-1139, 1994 U.S. Dist. LEXIS 21443, at *15 (S.D. Cal., May 3, 1994).

Dated: September 17, 2012                                Respectfully submitted,

                                                         COHEN MILSTEIN SELLERS
                                                         & TOLL PLLC

                                                         /s/ Kenneth M. Rehns
                                                         Kenneth M. Rehns (KR-9822)
                                                         88 Pine Street, 14th Floor
                                                         New York, New York 10005
                                                         Telephone: (212) 838-7797
                                                         Facsimile: (212) 838-7745

                                                         Carol V. Gilden
                                                         190 South LaSalle Street
                                                         Suite 1705
                                                         Chicago, IL 60603
                                                         Telephone: (312) 357-0370
                                                         Facsimile:  (312) 357-0369

                                                         Steven J. Toll
                                                         Daniel S. Sommers
                                                         Joshua M. Kolsky
                                                         1100 New York Ave NW
                                                         Suite 500 West
                                                         Washington, DC 20005
                                                         Telephone: (202) 408-4600
                                                         Facsimile: (202) 408-4699
                                                         -and-

                                                         O'DONOGHUE & O'DONOGHUE LLP
                                                         James R. O'Connell
                                                         Mark W. Kunst
                                                         4748 Wisconsin Avenue, N.W.
                                                         Washington, D.C.  20016
                                                         Telephone: (202) 362-0041
                                                         Facsimile:  (202) 362-2640

                                                         *Attorneys for the Plumbers and Pipefitters*
                                                         *National Pension Fund*

## CERTIFICATE OF SERVICE

I, Kenneth M. Rehns, hereby certify that, on September 17, 2012, I caused the foregoing document to be filed with the Court via the Southern District of New York's Electronic Filing System.  All Counsel of Record are required to be registered with the ECF System and will receive electronic notification of this filing.

/s/  Kenneth M. Rehns
Kenneth M. Rehns
