UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------x
                                 :

WILLIAM D. WALLACE ET AL.      :

                     :       **OPINION**

          Plaintiffs,   :

                     :    11 CV 8861 (TPG)

      – against –       :

                     :

INTRALINKS ET AL.          :

          Defendants.   :

                     :

                     :
------------------------------------------x

      Plaintiffs bring this federal securities class action against IntraLinks Holdings, Inc.'s ("IntraLinks") and IntraLinks' former CEO and CFO, as well as the individual signatories and underwriters in IntraLinks' April 6, 2011 secondary offering.  The complaint alleges violations of Sections 10(b) and 20(a) of the Exchange Act of 1934, and Sections 11, 12(a)(2), and 15 of the Securities Act of 1933.  On July 31, 2012, defendants filed a motion to dismiss the consolidated class action complaint.[1]

      Defendants' motion to dismiss is denied.  Plaintiffs state a claim under all of the causes of action based on the allegation that defendants made false and misleading statements related to the strength of IntraLinks' business and customer satisfaction, without disclosing the impending loss of its largest customer.  However, plaintiffs' claims that defendants made further false and

---

[1] The underwriter defendants submitted a separate motion to dismiss on the same day, but the motion stated it was joining in the other defendants' motion to dismiss.  The two motions to dismiss will therefore be considered in this opinion as the defendants' motion to dismiss.

misleading statements related to overbilling customers and revenue classification are insufficient to support any of the alleged claims.  These latter allegations fail to state a claim under the Exchange Act of 1934 primarily in their failure to plead loss causation.  The latter allegations are also not alleged as part of the Securities Act of 1933 claims.

**The Complaint**

For purposes of deciding the motion to dismiss, the court accepts the factual allegations in the complaint as true.  Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009).  The defendants challenge many of the allegations based on information from confidential witnesses.  The court however finds that the complaint provides sufficient information about each confidential witness's position and to whom they reported, to support the probability that they possessed the alleged information.  See Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000).  Accordingly, the court also accepts these allegations as true for the purposes of this motion.

The Parties

The lead plaintiff, Plumbers and Pipefitters National Pension Fund, is a Taft-Hartley, multiemployer defined benefit pension plan.  It brings this federal securities class action on behalf of itself and all others who purchased or acquired IntraLinks' common stock from February 17, 2011 through November 11, 2011 ("class period"), or who purchased IntraLinks' common stock

pursuant to the registration statement governing the April 6, 2011 secondary offering.

The defendants are divided into two groups according to the causes of action alleged against them.  The "Exchange Act Defendants" include IntraLinks; Andrew Damico, IntraLinks' Chief Executive Officer, President, and director during the class period; and Anthony Plesner, Intralinks' Chief Financial Officer and Chief Administrative Officer during the class period.  Both Damcio and Plesner signed all of IntraLinks' publicly filed documents during the class period and signed certifications pursuant to the Sarbanes Oxley Act of 2002, vouching for the truthfulness of IntraLinks' filings.  Damico resigned from his position on December 15, 2011 and Plesner resigned on May 3, 2012. The complaint alleges these defendants violated Section 10(b) and 20(a) of the Exchange Act, and Section 11, 12(a)(2) of Securities Act of 1933.

The "Securities Act Defendants" include IntraLinks and its board members who signed the registration statement issued for the secondary offering on April 6, 2011: Chairman of the Board, Patrick Wack, Jr., and directors Brian Conway, Peter Gyenes, Thomas Hale, Habib Kairouz, Robert McBride, Harry Taylor, and Damcio.  It also includes Plesner, who as CFO and CAO also signed the registration statement.  The complaint alleges these defendants violated Sections 11 and 12(a)(2) of Securities Act of 1933.

Finally, the "Underwriter Defendants" include all the investment banks who served as underwriters for IntraLinks' secondary offering on April 6, 2011:

Morgan Stanley & Co. Incorporated, Jefferies & Company, Inc., Lazard Capital Markets LLC, Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., and Pacific Crest Securities LLC.  The complaint alleges that these defendants violated Sections 11 and 12(a)(2) of the Securities Act of 1933.

Background on IntraLinks

IntraLinks is a public company with stock trading on the New York Stock Exchange ("NYSE").  IntraLinks provides "cloud-based" virtual data rooms ("VDRs"), which are secure web-based workspaces in which customers can easily share large amounts of sensitive information with specified other individuals or entities.  Historically, IntraLinks' business was divided between customers who used VDR services for mergers and acquisitions ("M&A") and those who used it for debt capital markets ("DCM").  Its customers were primarily financial services institutions and banks, and its business model was based on short-term contracts for project or transaction-specific subscriptions – typically three to twelve months.

In 2009, with an eye towards a third attempt to take the company public,[2] IntraLinks sought to diversify its business and seek out larger corporate clients who had long-term storage needs.  It created a new division called Enterprise which was to include only entities that "used IntraLinks as a repository, renewing its subscription for longer periods of time."  The Enterprise division thrived from the outset.  In 2009, Enterprise business

---

[2] The complaint alleges that IntraLinks had previously tried two times to take the company public , but was unsuccessful.

represented 40% of IntraLinks' 2009 revenue.  By September 2010, Enterprise revenue was up 59% year-over-year.

On August 6, 2010, after championing the growth of its Enterprise business division, IntraLinks went public with an offering of 11 million shares at a price of $13 per share.

On April 4, 2011, IntraLinks filed a Form S-1/A Registration Statement with the SEC indicating its intent to sell 7.5 million public shares.  On April 6, 2011, IntraLinks filed a prospectus and held a secondary offering where 7.5 million shares were sold at $25.20 per share.

<u>Background on Allegations of Misrepresentations</u>

The complaint alleges that IntraLinks made material misstatements and omissions relating to three aspects of its business.  First, plaintiffs claim that IntraLinks failed to disclose that its largest customer, the Federal Deposit Insurance Corporation ("FDIC"), told IntraLinks it would not renew its contract. Second, plaintiffs allege that IntraLinks misclassified business as Enterprise, which was more appropriately classified as DCM or M&A.  Finally, the complaint alleges that IntraLinks failed to disclose that it was utilizing antiquated accounting practices which resulted in overcharging customers by 20-30%.

The facts pertaining to these aspects of IntraLinks' business, as alleged in the complaint, will now be described.

Loss of FDIC as Customer

In 2000, the FDIC issued a request for proposals ("RFP") seeking VDR services.  Pursuant to this process, the FDIC selected IntraLinks and signed a "task order" on October 9, 2000.  The task order stated that IntraLinks would provide the FDIC with VDR services for five years with options to renew.

From 2000 to 2006, the FDIC's business provided IntraLinks with revenues between $200,000 and $600,000.  Then from 2007 to 2010, IntraLinks' revenue from the FDIC dramatically increased to approximately $13 million per year.  In 2009, the FDIC was the source of over 23% of revenue in the Enterprise sector of IntraLinks' business.  In 2010, it was over 15% of Enterprises' revenue and over 7% of IntraLinks' total revenue.  In comparison, the next largest customer constituted less than 2% of IntraLinks' total revenue.

Given that the FDIC's use of IntraLinks' services increased so dramatically and because IntraLinks was one of the most expensive VDR providers, the FDIC sought to renegotiate its contract in early 2010, but IntraLinks refused.  Robert Mullen, the Executive Vice President, said there was "absolutely no way" IntraLinks would renegotiate with the FDIC, and that IntraLinks was "going to put the screws to them."  The FDIC allegedly responded by saying they would not renew their contract with IntraLinks.

The FDIC issued a Request for Proposals ("RFP") in order to find an alternative VDR provider in July 2010.  On November 18, 2010, Plesner signed a contract modifying task order 16, which stated FDIC was "exercising the **final**

6

**6-month** option period" which would extend the original task order to June 9, 2011.  However, plaintiffs concede that this was not actually the final 6 month period, as the task order was amended on May 2011 to extend its effective time period to March 31, 2012.

On November 7, 2011, the FDIC issued a press release stating that it would be using a new vendor for its future VDR projects, but would continue using IntraLinks to wind up existing projects.

Misclassification of Business

Prior to the creation of the Enterprise department, IntraLinks had classified M&A transactions as M&A revenue and DCM transactions as DCM revenue.  However, with the creation of the Enterprise division, IntraLinks was no longer properly classifying its revenue streams according to the nature of the specific business transaction – i.e. M&A, DCM, or Enterprise (longer-term storage and hosting).  Instead, IntraLinks would group a customer's different transactions together and classify it as Enterprise, even if one or more of the transactions were more appropriately considered M&A or DCM.  They would also group multiple DCM or M&A customers together in order to define the group as Enterprise.  Managers were told at many meetings to "group multiple products under a single account relationship" even if unrelated, solely for the purpose of classify it as Enterprise.  Sometimes an existing customer who conducted DCM and M&A business would therefore be classified as Enterprise.

7

Ultimately, while Enterprise was supposed to consist of customers who used IntraLinks for long-term storage, it became the label used for the largest customers or any cross-departmental relationship.

The most dramatic misclassification involved the FDIC.  As described above, the FDIC was IntraLinks' largest customer by 2007, and prior to the creation of Enterprise, its business was classified as DCM.  In 2009, although there was no change in the business relationship between IntraLinks and the FDIC, the FDIC's business was reclassified as Enterprise.

The complaint appears to argue that the purpose of this misclassification was to make IntraLinks appear to be more diversified and able to attract long-term business.  According to the complaint, IntraLinks believed this will help the company be able to conduct a successful initial public offering.

Improper Billing Practices

IntraLinks billed its clients on a cost-per-page basis which worked well initially when almost all of its business involved scanning and uploading hardcopy documents.  However, in 2009, only around 5% of documents IntraLinks handled were from scanned hardcopies – the rest were uploaded in an electronic format.  IntraLinks tried to adapt to this change by using algorithms to estimate how many pages were equivalent to a megabyte, but the system was disorganized and inaccurate.

In 2009, IntraLinks updated its billing systems and discovered that the old system had been overbilling customers by 20-30%.  This finding was

brought to the attention of senior management.  However, rather than telling customers of the overbilling and switching to the new system, IntraLinks abandoned the new system and made no public disclosures.  The complaint alleges that when employees discussed the issues with Plesner he "would get threatening if you tried to dig too hard."

Alleged Misstatements and Omissions

The complaint contains detailed allegations of specific statements issued or made by the Exchange Act defendants, which plaintiffs claim were materially false and misleading.  Earlier in this opinion the court summarized the three subjects relating to which the defendants made misrepresentations.  The first is the failure to disclose the problems associated with IntraLinks' relationship with the FDIC.  The second is the allegation that IntraLinks misclassified business as Enterprise.  The third is the failure to disclose that it was over-charging customers.  The complaint alleges that the following quotations of statements made or issued by the Exchange Act defendants support these claims of misrepresentation.

The company's February 17, 2011 Form 8-K and corresponding press release highlighted the "significant growth in our Enterprise and Mergers and Acquisitions business."  Intralinks also estimated that revenue for 2011 would increase between 16-22%, and stated that the company believed it "has the market opportunity, leadership position and infrastructure to build a large and

highly profitable company."  February 17, 2011 is the opening date for the "class period" covered by this action.

It its March 23, 2011 Form 10-K IntraLinks again attributed its revenue increases to the growth of its Enterprise business, stating Enterprise was the company's "largest and fastest growing market.  We believe that we have a significant opportunity to increase our market share in these core markets." The Form 10-K also commended IntraLinks' strong and stable customer base stating "We believe our customers have a high level of satisfaction, as evidenced by the 104% renewal rate . . . for our subscription contracts during the year ended December 31, 2010."

The company's May 11, 2011 Form 8-K stated: "We remain confident about IntraLinks' outlook.  We continue to see strong market demand." IntraLinks projected that for the rest of 2011, "we expect to see a combination of growth, profitability and cash flow that is a standout in the Software-as-a-Service sector."  Plesner further stated that that the company would continue to "capitalize on our multi-billion dollar market opportunity that remains highly underpenetrated."

At the conference call of May 11, 2011 to discuss the reported results, Damico partially revealed a problem in the Enterprise business:

> Enterprise business faces a headwind as a result of a single Enterprise customer whose IntraLinks usage will significantly decrease over the remainder of the year.  The use of IntraLinks is [sic] counter-cyclical and revolves around the management and exchange of distressed and non-performing assets.  Because of the improving economy, there will be fewer distressed asset situations going forward, and therefore, we expect

10

that our revenue run-rate with this customer will be reduced by
approximately $2 million per quarter against our expectations.
Damico sought to downplay the significance stating:

We haven't see any fundamental changes whatsoever in the competitive
landscape, in the sales process, in our pricing, in the competitive
landscape, so we don't see any fundamental changes to what we shared
with you in the last earnings call.

IntraLinks' first quarter 2011 Form 10-Q reiterated the strength and

importance of the Enterprise business claiming that the increase in

Enterprise's revenue "was primarily driven by an increased customer base,

larger contract values for new customers . . . as well as higher exchange

utilization and renewal levels for existing customers."

IntraLinks' August 10, 2011 Form 8-K stated that the second quarter

results "reflect a combination of solid growth, profitability and cash flow," and

described the company as facing a "multi-billion dollar market opportunity."

The company's second quarter 2011 Form 10-Q reiterated the

statements made in the first quarter 2011 Form 10-Q, and further stated that

the growth in Enterprise revenue "reflects the wider adoption of our services

across customers' organizations."

On November 8, 2011, a day after the FDIC publicly announced it would

not use IntraLinks as its VDR vendor for future projects, IntraLinks filed a

Form 8-K which failed to disclose that FDIC had changed its vendor.  Instead,

IntraLinks only disclosed that growth in its Enterprise business was slowing,

with just an 11% increase, as opposed to the 15% increase in the second

quarter and a 33% increase in the first quarter of 2011.  And, in a press release

11

Damico stated that "we have not yet gained the momentum I would like to see in our Enterprise business; however, I am confident that our continuing investments in sales, customer service and marketing will allow us to achieve greater momentum going forward."  In the earnings conference call Damico further stated that "growth in our Enterprise business fell short of expectations," and attributed this to deficiencies in the sales force's quantity, composition, and tenure.

April 4, 2011 Secondary Offering Materials

IntraLinks' annual and quarterly filings with the SEC were incorporated by reference into the Registration Statement, and thus the complaint alleges that the Registration Statement contained the previously mentioned material false and misleading statements.

The alleged misstatements and omissions made in the April 4, 2011 Registration Statement are the same as those allegedly made in the March 23, 2011 Form 10-K.

**Analysis**

Legal Standard – Motion to Dismiss

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must plead sufficient facts to state a claim to relief that is plausible on its face. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); Ashcroft v. Iqbal, 556 U.S. 662, (2009).  In deciding such a motion, a court must accept as true the facts alleged in the complaint, but it should not assume the truth of its legal

conclusions.  Iqbal, 556 U.S. at 678-79.  A court must also draw all reasonable inferences in the plaintiff's favor, and it may consider documents attached to the complaint, incorporated by reference into the complaint, or known to and relied on by the plaintiff in bringing the suit.  ATSI Commc'ns, Inc. v. Shaar Fund. Ltd., 493 F.3d 87, 98 (2d Cir. 2007).  A court may also consider documents of which a plaintiff would have had actual notice as he drafted his complaint and which are integral to the claims set forth within it.  Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991).

**Section 10(b) and Rule 10b-5 of the Exchange Act**

In order to state a claim under Section 10(b) and Rule 10b-5 plaintiffs must allege that defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiff's reliance was the proximate cause of their injury."  In re Int'l Bus. Machs. Corp. Sec. Reg. Litig., 163 F.3d 102, 106 (2d Cir. 1998); see also 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

Claims brought under Section 10(b) and Rule 10b-5 are subject to the pleading standards of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act ("PSLRA").  Rule 9(b) requires that the complaint "state with particularity the circumstances constituting the fraud."  The PSLRA requires that plaintiffs "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading" and "state with

13

particularity facts giving rise to a strong inference that the defendant acted

with the required state of mind."  15 U.S.C. 78u-4(b)(1),(2).  Defendants claim

that the complaint fails to allege facts establishing a misrepresentation or

omission, scienter, or loss causation.

Misleading Statement or Omission – Risk of Losing the FDIC's Business

      Defendants contend that there was no material misstatement or

omission regarding the loss of IntraLinks' largest customer, the FDIC.

Specifically, defendants claim IntraLinks never lost the FDIC's business within

the class period, and even when the FDIC announced it was switching VDR

providers, it still promised to use IntraLinks for existing projects.

      Contrary to defendants' contentions, IntraLinks need not have lost the

FDIC's business within the class period in order for the statements to have

been misleading.  Plaintiffs argue that the failure to disclose that the FDIC

would not renew its contract in the future rendered several statements

misleading.  The most significant alleged misleading statements are the

following:

- "We believe that we have a significant opportunity to increase our market share in these core markets"
- "We believe our customers have a high level of satisfaction, as evidenced by the 104% renewal rate . . . for our subscription contracts during the year ended December 31, 2010"
- "We continue to see strong market demand"
- Highlighting the growth in the Enterprise market and attributing it to "higher exchange utilization and renewal levels for existing customers"

      Courts, though in other circuits, have recognized that the failure to

disclose the impending loss of a major customer can render optimistic

statements about the company misleading.  For example, in <u>Arkansas Pub.</u>
<u>Emps. Ret. Sys. v. GT Solar Int'l, Inc.</u>, the court found that statements "about
the market-leading position of the company's DSS furnace and its promotion of
recurring sales could be considered misleading in light of the undisclosed risk
that the product would very soon lose its spot atop the market, and a large
portion of its recurring sales" as a result of a customer's impending departure.
08 Cv-312, 2009 WL 3255225 at *9 (D. N.H. Oct. 7, 2009).

Given the circumstances discussed earlier, mainly that the FDIC had
told IntraLinks that it would seek an alternative VDR provider, these
statements touting the customer satisfaction, renewal rate and strong market
demand were misleading for the failure to disclose the impending loss of its
largest customer.

<u>Misleading Statement – Mischaracterization of Enterprise Business</u>

Plaintiffs properly plead that IntraLinks mischaracterized revenue as part
of its Enterprise business when it was more appropriately considered DCM and
M&A business.  Accordingly, the plaintiffs properly allege that figures regarding
Enterprise's growth and revenue, as well as statements that Enterprise was the
"largest and fastest growing" segment of its company were materially false and
misleading.

<u>Misleading Statement – Overbilling Customers</u>

However, plaintiffs fail to properly allege any false or misleading
statement related to IntraLinks' billing practices that resulted in overbilling

customers by 20-30%.  The complaint does not identify any statements made regarding these practices.  It is not clear what is meant by IntraLinks' claims of having a "high degree of revenue visibility," and thus it cannot be determined whether that is misleading.

To the extent the complaint relies upon IntraLinks' reported revenue and growth figures, it is not apparent that such figures are misleading based on the fact that IntraLinks overcharged.  While customers may have overpaid, the complaint does not allege that IntraLinks' reported revenue failed to match the amount actually collected.  Accordingly, plaintiffs fail to state a claim based on defendants' alleged overbilling practices.

Scienter

In order to state a claim under Section 10b and Rule 10b-5 of the Exchange Act, a plaintiff must "state with particularity facts giving rise to a strong inference" of scienter, which "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfradulent intent."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314, 328.  A plaintiff can satisfy this requirement by alleging facts to show "strong circumstantial evidence of conscious misbehavior or recklessness."  ECA & Local 134 IBEW Joint Pension Trust of Chi. V. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009).

Reckless conduct is defined as "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary

16

care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Novak, 216 F.3d at 308.  Recklessness is adequately alleged when a plaintiff claims that "(1) *specific* contradictory information was available to the defendants (2) *at the same time* they made their misleading statements." In re Marsh & McLennan Cos., Inc. Sec. Litig. 501 F. Supp. 2d 452, 484 (S.D.N.Y. 2006) (emphasis added).

Loss of FDIC's Future Business

In alleging Damico and Plesner knew it was likely that IntraLinks would lose the FDIC's business, the complaint claims that they were involved in the IntraLinks' executive policies, which included the decision in 2010 not to renegotiate the FDIC contract.  It also included the execution of the final 6 month extension of the FDIC's contract in November 2011, which Plesner himself signed.  Defendants argue that this does not establish scienter because the task order was later further extended.  However, the allegation that Damico and Plesner were involved in a contract which stated it was the final extension, indicates Damico and Plesner were aware of a significant probability that IntraLinks would lose the FDIC's future business.  At the motion to dismiss stage the court must make such reasonable inferences in the plaintiff's favor.

 In addition the complaint alleges that the loss of the FDIC's business was discussed at several meetings with management, though the strength of

17

this allegation is undermined by the fact that it is not alleged whether Damico and Plesner were present at those meetings.

The complaint also provides several other allegations that support IntraLinks' scienter due to the scienter of top executives.  This includes Mullen's refusal to renegotiate the contract with the FDIC, and the FDIC's response that it would seek alternative providers.

Core Business

Plaintiffs also allege that it is proper to infer that Damico and Plesner knew of the likelihood that IntraLinks would lose the FDIC's business based on the "core operations" doctrine.  This doctrine states that if a complaint pleads that a defendant made false or misleading statements "when contradictory facts of critical importance to the company either were apparent or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions with the company."  In re Atlast Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004).  The passage of the PSLRA has threatened the validity of this doctrine.  However, this circuit appears to accept that although the doctrine cannot provide the sole basis for inferring scienter, it can provide additional evidence.  See New Orleans Emps. Ret. Sys. V. Celestica, Inc., 455 Fed App'x 10, 14 n.3 (2d Cir. 2011); In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011) (collecting cases).

The fact that the FDIC was IntraLinks' largest customer and a substantial part of the Enterprise division, which was a key focus of IntraLinks' revenue reports, provides a basis for the core operations doctrine. The court finds that there is some additional evidence that Damico and Plesner were aware that IntraLinks would likely lose the FDIC's business because as CEO and CFO they would likely remain informed about developments with a crucial part of its business. This is not the sole basis for this court finding scienter, but when added with the previously mentioned allegations, the court finds there are sufficient allegations of scienter.

Scienter of IntraLinks

A corporate defendant's scienter is derived from its employees. Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 101 (2d Cir. 2001). Thus the knowledge of a company's executives and senior management can be attributed to a corporate defendant. In re JP Morgan Chase Sec. Litig., 363 F.Supp.2d 595, 627 (S.D.N.Y. 2005).

Therefore because the complaint sufficiently alleges the scienter of Plesner and Damico, the CFO and CEO, as well as Mullen, the Executive Vice President of sales, the complaint also alleges the scienter of IntraLinks.

Scienter - Misclassification of Enterprise Revenue and Overbilling

The complaint properly pleads that Plesner was aware of the overbilling practice. Specifically, the complaint alleges that sales associates discussed the issue with Plesner who "would get threatening if you tried to dig too hard." The

19

allegations regarding Damico's knowledge of the overbilling practices, and both Plesner and Damico's knowledge regarding the misclassification of Enterprise's revenue is more general.  However, the court need not determine whether they are sufficient to support scienter, since these claims fail to allege loss causation, as discussed in the following section of this opinion.

Loss Causation

In order to state a claim for securities fraud a plaintiff must prove "that the act or omission of the defendant alleged . . . caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. 78u-4(b)(4); see also Dura Pharm., Inc. v. Broudo, 544 U.S. 366, 346-47 (2005).  This can be pled by "alleging either a corrective disclosure of a previously undisclosed truth that causes a decline in the stock price or the materialization of a concealed risk that causes a stock price to decline."  In re American Intern. Group, Inc., 741 F. Supp. 2d 511, 534 (S.D.N.Y. 2010).  The pleading of loss causation is governed by Rule 8 notice pleading, and therefore a complaint only needs to provide "some indication of the loss and the causal connection that the plaintiff has in mind."  Dura Pharm., 544 U.S. at 346-47.

Corrective Disclosure - Loss of the FDIC's Business

It is undisputed that the complaint alleges a corrective disclosure regarding IntraLinks' loss of its largest customer the FDIC, which caused a drop in IntraLinks' stock price.  The first partial corrective disclosure regarding the loss of FDIC's business occurred during the earnings conference call on

May 11, 2011, when Damico stated that one Enterprise customer was reducing its usage of IntraLinks' services.  However, Damico did not reveal that this customer was IntraLinks' largest, the FDIC, or that the loss entailed an expiration of its contract, with a substantial risk that it would not be renewed. Instead, the loss was attributed to the fact that IntraLinks' business was countercyclical and the economy was improving.  While the stock had closed at $29.99 per share the day before, after this partial disclosure IntraLinks' stock closed at $20.22 per share.

Full disclosure occurred on November 7, 2011 when the FDIC issued a public statement that "Beginning in November 2011, the FDIC will begin using the RR Donnelley VDR known as Venue instead of IntraLinks for all new projects.  IntraLinks will host projects initiated before November 2011 until they are resolved."  The complaint does not indicate the disclosure's effect on IntraLinks' stock price.

<u>Corrective Disclosure Overbilling and Misclassification of Enterprise Revenue</u>

The complaint fails to allege a corrective disclosure for the alleged misstatements regarding Enterprise's revenue recognition practices and accounting problems.  The complaint never claims that the market was informed of these issues and in fact states that "the Company never disclosed . . . the issues with their revenue recognition systems or that it was overbilling customers by twenty or thirty percent."  Plaintiffs rely upon Damico's

21

statements attributing poor financial results to problems in the sales force, but this does not constitute a disclosure of revenue recognition issues or accounting problems.  See Janbay v. Canadian Solar, Inc., No. 10 Civ. 4430, 2012 WL 1080306, at *15 (S.D.N.Y. Mar. 30, 2012).

 The complaint also alleges that there was a disclosure regarding the SEC investigation, but the complaint itself states that neither the SEC nor IntraLinks provided any details about the reasons behind this subpoena.  The only publicly available information about the subpoenas was that the SEC was "requesting certain documents related to the Company's business from January 1, 2011 to the present."  An announcement of an SEC subpoena is itself insufficient to plead loss causation.  Id.  Even the alleged speculation of some analysts as to the reasons behind the SEC subpoena is insufficient to constitute a disclosure of the truth.  See In re Omnicom Grp. Inc. Sec. Litig., 597 F.3d 501, 512 (2d Cir. 2010).

Finally, the fact that IntraLinks revised its earnings projections also does not indicate that there was a corrective disclosure regarding the revenue recognition and accounting policies.  See In re AOL Time Warner, Inc. Sec. Litig., 503 F. Supp. 2d 678-79 (S.D.N.Y. 2007).

Materialization of Risk - Misclassification of Enterprise Revenue and Overbilling

The complaint fails to plead loss causation through a materialization of risk theory as well.  The materialization of risk theory requires that a concealed

risk come to light "in a series of revealing events that negatively affect stock price over time." In re Vivendi Universal, S.A. Sec. Litig., 765 F. Supp. 2d 512, 554 (S.D.N.Y. 2011).  The plaintiff must show that the loss is foreseeable and that the loss was caused by the materialization of the concealed risk.  See Solow v. Citigroup, Inc., 827 F. Supp. 2d 280, 292 (S.D.N.Y. 2011).

Here the theory is presumably that IntraLinks' failure to disclose that it was misclassifying Enterprise's revenue and overbilling clients hid the risk that IntraLinks' financial results were not sustainable.  The materialization of this risk would ultimately harm IntraLinks' share price when revenue inevitably fell. But the complaint contains no allegation linking the decrease in IntraLinks' stock price to a materialization of these risks.  Although the complaint alleges that IntraLinks reported weak revenues, it does not claim that this was due to any changes or revelations about how IntraLinks classified its Enterprise revenue or billed its clients.  Instead, the only allegation is that the poor financial results were attributed to problems in the quality of the sales force. Plaintiffs have therefore failed to plead loss causation.

Overall, the claims against the Exchange Act defendants regarding allegedly false and misleading statements about billing practices and classification of Enterprise revenue should be dismissed for the failure to plead loss causation.

Reliance

The complaint invokes the fraud-on-the-market presumption in order to plead reliance. In invoking this presumption, the complaint alleges that IntraLinks' common stock traded on the NYSE, an efficient market. The complaint also states that IntraLinks, as a regulated issuer, filed periodic public reports with the SEC and NYSE. In addition, several securities analysts followed IntraLinks and wrote public reports about the company.

## Section 11 and 12(a)(2) of the 1933 Act

To state a claim under Section 11 of the Securities Act of 1933 Act, a plaintiff must allege that he purchased a registered security either directly from the issuer or in the aftermarket following the offering; that the defendant participated in the offering in a manner specified by the statute; and that the registration statement contained an untrue statement of material fact or failed to state a material fact needed to make the statements therein not misleading. 15 U.S.C. §§ 77k(a).

Section 12(a)(2) of the Securities Act of 1933 provides a similar cause of action, but requires that the plaintiff allege that the defendant is a "statutory seller;" that the sale was pursuant to a prospectus or oral communication; and that the prospectus or oral communication contained a material misstatement or omission. 15 U.S.C. 77l(a)(2).

Issuers and signatories are subject to strict liability under section 11, while remaining potential defendants under Sections 11 and 12(a)(2) are

24

subject to liability for negligence.  Panther Partners Inc. v. Ikanos Commcn's Inc., 681 F.3d 114, 120 (2d Cir. 2012).  Scienter, reliance, and loss causation are not elements of Section 11 or 12(a)(2) claims.  Id.  However, the heightened pleading standard of Rule 9(b) applies when those claims are premised on allegations of fraud.  Rombach v. Chang, 355 F.3d 164, 172 (2d Cir. 2004). The parties dispute whether Rule 9(b) applies to the Section 11 and 12(a)(2) claims in this case and the implications if it does apply.

Because the grounds for dismissing the Section 11 and 12(a)(2) claims are premised on the same basis, and the same pleading standard applies, the court will analyze the claims together.

Law Regarding when Rule 9(b) Applies to Section 11 and 12(a)(2) Claims

Rule 9(b)'s heightened pleading standard applies to Section 11 and 12(a)(2) claims that are premised on allegations of fraud.  Id. at 171.  In determining whether to apply Rule 9(b) courts examine whether the gravamen of the complaint is fraud.  Id.  The fact that the alleged misstatements supporting the Section 11 and 12(a)(2) claims are the same as those in the Section 10(b) claims is not dispositive.  See In re IAC/InterActiveCorp. Sec. Litig., 695 F.Supp.2d 109 (S.D.N.Y. 2010).  Furthermore, allegations that statements were "materially false or misleading" and contained "untrue statements of material fact" do not necessarily sound in fraud because such allegations simply track the language of Section 11 and 12(a)(2).  See In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 375 (S.D.N.Y. 2011).  A

complaint is allowed to plead Section 10(b) fraud and Section 11 negligence claims as alternatives, as long as the complaint is organized in a way that allows the court to determine which allegations support which claim.  See In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007).

In this case plaintiffs go beyond merely disclaiming any allegation of fraud for its Section 11 and 12(a)(2) claims.  Plaintiffs have properly separated their Section 10(b) allegations based on fraud, from their Section 11 and 12(a)(2) allegations based on negligence.  The complaint offers a different theory for liability for the latter claims- that defendants negligently failed in their duty to investigate and ensure the truth of statements in the registration and prospectus.  Furthermore, the allegations that IntraLinks failed to disclose a *known* uncertainty supports the claim of Section 11 and 12(a)(2) liability pursuant to Regulation S-K, which plaintiffs are able to allege without requiring the application of Rule 9(b).  See Citiline Holdings, Inc. v. iStar Financial Inc., 701 F.Supp.2d 506, 513 (S.D.N.Y. 2010) ("[T]hat a fact was known and not disclosed does not mean, as a matter of law, that the circumstances of the resulting omission sound in fraud.") (citation omitted).

The Section 11 and 12(a)(2) claims are thus governed by the pleading standard in Rule 8(a).  This rule requires a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  This standard does not require "detailed factual allegations," but it does require more than "labels and conclusions" or "a formulaic recitation of the elements of

a cause of action will not do." <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007).

<u>Overbilling of Customers</u>

The complaint makes no claims regarding IntraLinks' billing practices in the portion of the complaint relating the Section 11 and 12(a)(2) claims and as such the court need not address this issue.

<u>Classification of Enterprise Revenue</u>

To the extent the complaint attempts to assert Section 11 and 12(a)(2) claims based on the classification of Enterprise revenue, the allegations are insufficient.  Nowhere in the portion of the complaint related to the Section 11 and 12(a)(2) claims is there any allegation that the classification of existing customers such as the FDIC into the newly created division, Enterprise, was wrong.  Just because a company such as the FDIC was once classified as DCM or M&A does not preclude them from being properly reclassified when a new business division is created.  The complaint even admits that the Enterprise classification was for customers who used IntraLinks on a longer term basis, and that the FDIC was such a customer.  Although the complaint claims that the Enterprise business was not growing as fast as IntraLinks' claimed, there are no factual allegations to support this claim.  The complaint can therefore not base any allegations of materially false or misleading statements on how IntraLinks classified its Enterprise business.

Loss of the FDIC as a Customer

Plaintiffs claim that defendants were negligent in failing to investigate the statements to ensure that they were true and there were no omissions of material facts.  More specifically, plaintiffs appear to allege that defendants negligently failed to discover that the FDIC's contract with IntraLinks was expiring and that the FDIC was unlikely to renew given IntraLinks' refusal to renegotiate.  According to the complaint, the registration and prospectus contained materially misleading statements because they failed to disclose such information or temper positive statements about IntraLinks' business. The complaint alleges that the following statements were misleading given the risk that the FDIC would not renew its contract with the FDIC:

- "this enterprise market is our largest and fastest growing market. We believe that we have a significant opportunity to increase our market share in these core markets based on the strength of our solutions"
- "We believe our customers have a high level of satisfaction, as evidenced by the 104% renewal rate . . . No customer represented more than 10% of our revenue in 2008, 2009 or 2010."

Without alleging that Damico Plesner knew of the circumstances, the complaint repeats allegations that IntraLinks was aware that the FDIC would likely stop doing business with Intralinks.  For example, it alleges that IntraLinks refused to renegotiate its contract with the FDIC, to which the FDIC responded that it would seek alternative providers.  Given these circumstances, the complaint properly pleads that the statements were materially false and misleading.

28

Defendants assert that the statements were not materially false and misleading because of meaningful cautionary language in the risk factors section.  The section contained statements including:

- "Our business depends substantially on customers renewing and expanding their subscriptions for our services.  Any decline in customer renewals and expansions would harm our future operating results."
- "We cannot assure you that any of our customer agreements will be renewed.  Our renewal rates may decline due to a variety of factors
- "If our renewal rates are lower than anticipated or decline for any reason, or if customers renew on terms less favorable to us, our revenue may decrease and our profitability and gross margin may be harmed, which would have a material adverse effect on our business, results of operations and financial condition."

When a disclosure contains cautionary language, the court analyses the fraudulent materials in their entirety to determine whether a reasonable investor would have been mislead.  <u>Halperin v. eBanker USA.com, Inc.</u>, 295 F.3d 352, 357 (2d Cir. 2002).  The key question is whether the omissions considered in the context of the whole document would affect the total mix of information and mislead a reasonable investor regarding the nature of the securities.  <u>Id</u>.

In this case where the allegation is that IntraLinks had specific information that its largest customer was planning to not renew its contract, the generic cautionary language is insufficient.  When the document is viewed as a whole the court finds that a reasonable investor would have been misled where specific statements touting the high customer satisfaction and renewal rates are made without disclosure that the largest customer is likely to terminate its business with IntraLinks.

29

**Conclusion**

For the aforementioned reasons the motion to dismiss is denied.


Dated:  New York, New York
        May 8, 2013

                                    Thomas P. Griesa
                                    U. S. District Judge


USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 05/08/13